(No. 21355.—

EDWIN A. GREEN, Appellant, *vs.* CARLOS E. BLACK *et al.* Appellees.

*Opinion filed June 16, 1933.*

624

Dunn, Duncan and DeYoung, JJ., dissenting.

KRINSKY, LEVITAN & GLASSNER, for appellant.

OTTO KERNER, Attorney General, and HARLINGTON WOOD, (BURNETTE M. CHIPPERFIELD, WEYMOUTH KIRKLAND, and PAUL F. JONES, of counsel,) for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

Appellant filed a bill in the superior court of Cook county seeking to restrain General Carlos E. Black, Adjutant General of the State, Charles C. Dawes, Francis M. Allen and Thomas S. Hammond, commanding officers in the State militia of this State, from the use, other than by deposit in the State treasury, of such moneys as were derived from the rentals of certain State armories located in the city of Chicago. Allen and Hammond were dismissed as defendants. Black and Dawes demurred to the bill. The demurrer was sustained and the bill was dismissed for want of equity. The cause is here on appeal.

The bill sets out the maintenance of the various armories as property of the State and alleges that the Adjutant General has general supervision over the armories; that the Broadway armory, located at 5815 Broadway, in the city of Chicago, is under the immediate supervision of Charles C. Dawes; that it has been, and is from time to time, rented to various organizations for purposes not having to do with the training of the National Guard; that during the past seven years the rentals therefrom have aggregated $24,000, and that other funds have been derived from that property as rentals, the amount of which the com-

plainant is not advised. The bill also alleges that the rents so derived are not deposited in the State treasury but are kept by the officer in command of the armory, with the knowledge of the Adjutant General, in bank accounts designated as the "Armory or regimental fund;" that such rentals belong to the State and should be paid into the State treasury, and that there was no authority for depositing them otherwise.

Appellees, in support of their demurrer, invoke section 3½ of article 18 of the military and naval code of this State. (Cahill's Stat. 1931, p. 2669; Smith's Stat. 1931, p. 2826.) Section 3½ reads as follows: "Subject to such reasonable regulations as may be promulgated by the Adjutant General, the use of armories may be permitted for any reasonable and legitimate civilian activities so long as such activities do not interfere with their use for military purposes. Any proceeds received in any armory above the expenses incident to such use may be placed in an armory fund and used for recruiting, athletic and recreational activities and other purposes in the interest and for the benefit of the members of the company or companies at the particular armory." This section was enacted by the legislature in 1931 as an addition to an act entitled "An act to authorize the erection of an armory at Chicago, Illinois, for the use of naval forces of the State of Illinois and making an appropriation therefor," approved June 29, 1927.

Appellant argues that under the constitution all rentals arising from such armories must be deposited in the State treasury and can be withdrawn therefrom only in pursuance of appropriations made by law, and then only on warrants issued against the appropriation by the State Auditor of Public Accounts, and since this is so, section 3½ violates these constitutional requirements and is void. The parts of the constitution against which it is said this act offends are article 3, section 17 of article 4 and section 23

of article 5. The argument is that there is provided but one depository for public moneys and that is the State treasury, and that all public funds must be deposited there, and that as the rentals of armories are revenues from the property of the State they are State revenues, and in contemplation of the law are money in the State treasury and must be there deposited. No section of the constitution in express terms requires that this be done, and cases cited by appellant do not support his contention that by implication arising from the language of the constitution such duty exists.

Section 1 of article 5 creates the office of State Treasurer and prescribes his duties. Section 7 of article 9 requires that all taxes levied for State purposes shall be paid into the State treasury. Section 23 of article 5 provides that all fees payable by law for any services performed by an officer, as provided in article 5, shall be paid in advance into the State treasury. These are the only constitutional provisions which directly impose any duties on the State Treasurer or deal with the payment of State funds into the State treasury. When State money has once been received by the State Treasurer, section 17 of article 4 of the constitution prevents its withdrawal except in pursuance of an appropriation made by law and on the presentation of a warrant issued by the Auditor of Public Accounts. (*People* v. *Russel*, 311 Ill. 96.) The constitutional provisions relied upon by the appellant refer only to the means of withdrawing public funds from the State treasury or the payment thereinto of fees of State officers or taxes. (*People* v. *Lippincott*, 65 Ill. 548; *People* v. *Miner*, 46 id. 384.) The provisions relied upon by appellant do not, nor do any other provisions of the constitution, require the payment into the State treasury of moneys paid for the use of State armories by civilians or private organizations. The General Assembly has control of the revenues and finances of the State, restricted only by constitutional provisions.

The General Assembly may provide, as to revenues other than State taxes and the fees of State officers, that when such revenues are collected they may be appropriated to a use specified in the act. Such is, in effect, an appropriation of such revenues to the purpose so specified and amounts to a declaration that such revenues are not to be paid into the State treasury.

The question then arises, Has the legislature determined that funds arising from the rental of these armories shall be deposited otherwise than in the State treasury and used in a manner other than through legislative appropriations and warrants of the Auditor of Public Accounts? The language is, as we have seen, that the proceeds from such rental above expenses incident to such use may be placed in an armory fund and used for recruiting, athletic and recreational activities and other purposes in the interest and for the benefit of the members of the company at the particular armory from which the rentals have accrued. Counsel urge that statutory provisions require the deposit of these funds in the State treasury, and that section 3½ was not designed or intended by the legislature to amend or change such statutory provisions. They point to section 7 of the act relating to the State treasurer, approved April 23, 1873, (Cahill's Stat. 1931, p. 2682,) which declares that the State Treasurer shall receive the revenues and all other public moneys of the State, and section 2 of an act in relation to the payment of public money into the State treasury, enacted in 1911, (Cahill's Stat. 1931, p. 2638,) which provides that it shall be the duty of every officer, board, commission, commissioner, department, institution, arm or agency of the executive department of the State government, the University of Illinois excepted, to pay into the State treasury without delay, and in any event within thirty days, the gross amount of money received for or on behalf of the State, without any deduction on account of fees, salaries, costs, expenses or claims.

In construing a statute the purpose of the act is to be kept in mind and the words used are to be liberally construed to that end. (*People* v. *Harrison,* 191 Ill. 257; Smith's Stat. 1931, chap. 131, sec. 1.) Prior to July 1, 1911, the only statutory provision with reference to the deposit of money arising in the State militia was section 20 of article 6 of the State Militia act, (Smith's Stat. 1931, p. 2819,) which provided that all moneys arising from the sale of damaged or surplus military stores and property shall be turned into the State treasury and shall constitute a fund to be known as the State military fund, to be kept separate and paid out only on proper vouchers certified by the Adjutant General and approved by the commander in chief. In 1911 an act was passed declaring that the Secretary of State, Auditor of Public Accounts, Superintendent of Public Instruction, Adjutant General, and all like executive and administrative boards, departments and institutions of the State government therein named, are agencies and departments of the State government, and that all moneys received by each of such officers, boards, commissions, departments or institutions for or on behalf of the State shall be paid into the State treasury, to be paid out only on appropriation and warrant of the Auditor of Public Accounts. In 1917 the Fiftieth General Assembly passed what is commonly known as the Civil Administrative Code. (Hurd's Stat. 1917, p. 595; Laws of 1917, p. 2.) That act did not include the State militia nor the Adjutant General in the division of officers, commissions, boards and departments of the State. In 1921 the General Assembly amended sections 1, 2 and 4 of the act of 1911 referred to, (Laws of 1921, p. 586,) by adding sections 2a and 2b. Section 1 as so amended then provided that the officers of the executive department of the government of the State, the clerk of the Supreme Court, the departments of State government created by the Civil Administrative Code in 1917, and all other officers, boards, commissions, commissioners, depart-

ments, institutions, arms or agencies of the executive departments of the State, the University of Illinois excepted, are subject to the provisions of this act. It will be observed that these amendments designated who should be the officers of the executive departments of the State government, and that the Adjutant General was not included in that list as amended.

Until the enactment of section 3½ of article 18 of the State Militia act herein quoted, in 1931, no express authority existed for renting a State armory to anyone. By section 3 of article 18 of the State Militia act enacted in 1927 the armory of each regiment or division is made subject to the orders of the Adjutant General and put under the charge of its commanding officer, who is required to keep therein all property furnished by the State. In section 3½ of this act it provides for the rental of property and placing the income therefrom in a fund to be used for the benefit of the members of the company at that particular armory. It is thus seen that such rentals constitute a new type of revenue created by section 3½. The section creating that revenue provides a new and different manner and means of its disposal. This must be our determination of the intent of the legislature in enacting section 3½, for if it was not the purpose to provide a new and different means of using such funds no reason may be perceived for its enactment, since it would neither add to nor change the statute as it then existed. The fact that the legislature has provided that such funds are to be used for recruiting, athletic and recreational activities "and other purposes" in the interest and for the benefit of "the company or companies at the particular armory," evidences a particular use and appropriation of funds, and discloses, we think, quite clearly, an intention that such rentals are not to be treated as other public funds are treated and controlled but used for purposes not common to the application of public funds

and for the benefit of the companies at the armories where the rentals arise. This the legislature had the right to do.

Courts are required, in the construction of statutes, to determine, if possible, the intention of the legislature. Section 3½ does not purport to be an amendment of any other act but is a separate act, which, if it be given any force, must be held to be the means adopted by the legislature to provide a particular fund for the named uses of the company or companies of the armory from which the fund is derived, and it seems clear that to deny it such meaning is to deprive it of any reason or purpose for its enactment. It is a rule of construction that statutes *in pari materia* are to be construed together as though constituting one act. This rule applies, however, only to such statutes as are in themselves consistent with each other. The provisions of section 3½ are not consistent with earlier enactments on the subject of the deposit of State revenue, but evidence a definite legislative intent to change the law as to the deposit and use of State funds by creating a new and different fund to be used in a different manner and for a new purpose. This being true, appellant's contention that the funds must be paid into the State treasury cannot be sustained, and the superior court was right in sustaining the demurrer to his bill and dismissing the same for want of equity. Its decree will be affirmed. *Decree affirmed.*

Mr. JUSTICE DUNN, dissenting:

I disagree with the judgment affirming the decree of the superior court. I concur in the proposition announced that no section of the constitution requires that all public funds of the State shall be deposited in the State treasury and that the cases cited by the appellant do not support his contention that the requirement exists by implication arising from the langauge of the constitution.

It must be conceded that the sums received for the use and occupation of the armories belong to the State. The

armories were the property of the State in the custody and care of the commanding officer. He was the agent of the State, and it is a fundamental principle of the law of agency that the agent must account to his principal for every profit arising out of the property of the principal in the agent's control. The right of the General Assembly to control the fund received for the use of the property cannot be questioned.

The office of State Treasurer was created by section 1 of article 5 of the constitution, and his duties prescribed by that section are, to reside at the seat of government during his term of office, keep the public records, books and papers there, and perform such duties as may be prescribed by law. By sections 12 and 15 of the State Treasurer's act of 1873 the State Treasurer is required to keep an account of all money received and paid by him, and at least ten days before each regular session of the General Assembly to present a full report thereof to the Governor. (Smith's Stat. 1931, p. 2834.) Section 7 of article 9 of the constitution requires all taxes levied for State purposes to be paid into the State treasury. Section 23 of article 5 provides that all fees payable by law for any services performed by any officer provided for in this article of the constitution shall be paid in advance into the State treasury. These are all the constitutional provisions which directly impose any duties on the State Treasurer. The title of his office is so far indicative of the nature of his duty to have charge of the collected funds of the State that the General Assembly could not wholly deprive him of their custody and care, though it might direct him as to the manner in which the funds should be taken care of. Neither of the first two constitutions of the State contained the requirement of the present constitution, that all taxes levied for State purposes and fees of State officers should be paid into the State treasury. In 1867 the General Assembly passed an act requiring the collector of St. Clair county to pay all State

taxes levied in four townships to the treasurer of the American Bottom Board of Improvements for the purpose of paying expenses to be incurred in building, improving or repairing levees and embankments to prevent the lands in the American bottom in those four townships from being overflowed by the waters of the Mississippi river. (Laws of 1867, p. 152.) The collector, in accordance with this act, paid to the treasurer of the county $8000 of State taxes collected in the four townships, but the Auditor refused to allow the payment on settlement with the collector. The collector then sued out an alternative writ of *mandamus* against the Auditor commanding him to show cause why a peremptory *mandamus* should not issue requiring him to give the credit claimed. The act was held valid and not to be a release from the State taxes but to be merely a diversion of them before their payment into the State treasury, which was within the power of the General Assembly. (*People* v. *Miner,* 46 Ill. 384.) This was in 1868.

It is evident that section 7 of article 9 of the constitution of 1870 was adopted for the purpose of preventing the evasion of the prohibition in section 6 of the release or discharge of any political subdivision or municipality or its inhabitants from their or its proportionate share of taxes to be levied for State purposes or any commutation for such taxes. (Debates of the Constitutional Convention, pp. 1196-98.) In 1872, after the adoption of the constitution, an application was made to this court for a *mandamus* similar to that sought in *People* v. *Miner, supra,* to enforce payment to the Kaskaskia River Navigation Company of State taxes levied and collected in certain townships in Randolph county under an act passed in 1869 entitled, "An act supplemental to 'An act to incorporate the Kaskaskia River Navigation Company,' approved February 8, 1853, for the purpose of giving State aid to enable the counties and towns on the same to aid said company," directing that the taxes levied and collected for State purposes for the years

1868 and 1869, and for eight years thereafter, within nine described townships in Randolph county, be appropriated and applied to the construction of the improvement contemplated by the act incorporating the navigation company and providing for the payment by the county collector to the treasurer of the company of all the State taxes levied on the real estate in those townships for the years mentioned, as soon as collected, subject to the commencement in good faith and prosecution of the work. (2 Private Laws of 1869, p. 872.) The court held that the act in question was repugnant to section 7 of article 9 of the constitution and became inoperative upon the adoption of that instrument. *People* v. *Lippincott,* 65 Ill. 548.

The General Assembly has control of the revenue and finances of the State, restricted only by constitutional provisions. From the two cases cited it appears that the General Assembly may provide for the custody of revenue of the State, except that derived from State taxes and the fees of State officers, otherwise than by payment into the treasury. When it has once been received by the State Treasurer, however, section 17 of article 4 provides that it can be drawn from the treasury only in pursuance of an appropriation made by law and on the presentation of a warrant issued by the Auditor. *Burritt* v. *Comrs. of State Contracts,* 120 Ill. 322; *People* v. *Russel,* 311 id. 96.

None of the constitutional provisions on which the appellant relies as requiring the sums received for the rent of the armory to be paid into the State treasury have anything to do with such requirement. They refer only to the means of getting the money which is in the treasury out of it, and it is clear that the only means of doing that is by an appropriation made by law. There is therefore no constitutional provision requiring the payment of the money received as rent for the use and occupation of the armory by civilians into the State treasury.

However, the adoption of the constitution of 1870, with its requirement that all taxes levied for State purposes and all fees for services rendered by State officers should be paid into the State treasury, which limited the power of the General Assembly over those two items of revenue and rendered the decision of *People* v. *Miner, supra,* inapplicable under the new constitution, indicated a change of public policy in regard to the State Treasurer's office and the management of the public revenue. The practice of special legislation in innumerable ways, so that different rules of law were applied to particular persons or in particular cases, was prohibited in a great many classes of cases in which it had prevailed under the previous constitutions. The inequality of taxation of which *People* v. *Miner* was an instance was abolished, as was shown by the decision of *People* v. *Lippincott, supra.* In the revision of the statutes after the adoption of the new constitution the General Assembly carried the public policy indicated by these provisions of the new constitution still further by enacting a revision of the law in relation to the State Treasurer, (Laws of 1873, p. 186,) section 7 of which provided that the State Treasurer shall receive the revenues and all other public moneys of the State and all moneys authorized by law to be paid to him and safely keep the same. (Cahill's Stat. 1931, p. 2682; Smith's Stat. 1931, p. 2834.) The Forty-seventh General Assembly in 1911 enacted the law in relation to the payment of the public money of the State into the State treasury, which is referred to in the opinion adopted by the court, sections 1 and 2 of which are as follows:

"Sec. 1. * * * That the Secretary of State, the Auditor of Public Accounts, the Superintendent of Public Instruction, the Adjutant General, the Insurance Department of the State of Illinois, the Board of Administration, the Charities Commission, the Board of Commissioners for the Management of the State Library, the Illinois Stallion Reg-

istration Board, the Board of Livestock Commissioners, the Board of Veterinary Examiners, the Railroad and Warehouse Commission, the chief inspector of grain, all deputy inspectors of grain, warehouse registrars and their assistants, all State weigh-masters, the State Commissioners of Labor, the chief inspector of private employment agencies, the State Board of Examiners of Architects, the Board of Examiners of Barbers, the Board of Fish Commissioners, the State game commissioners, the State Board of Health, the State Board of Pharmacy, the Illinois State Board of Dental Examiners, the miners' examining boards of the respective counties, the State Board of Examiners of Registered Nurses, the State entomologist, the State fire marshal, the State food commissioner, and all like executive and administrative boards, commissions, commissioners, departments and institutions of the State government herein named, are hereby declared to be officers, arms, agencies and departments of the State government, and all moneys received by each of such officers, boards, commissions, commissioners, departments or institutions, for or on behalf of the State, from fees, fines, penalties, forfeitures, rentals, the sales of property or from other like sources, shall be paid into the State treasury, and no such officer, board, commission, commissioner, department or institution shall expend any money so received, for salaries, expenses or for any other purpose, except upon the warrant of the Auditor of Public Accounts based upon appropriations from the State treasury made biennially by the General Assembly.

"Sec. 2. It shall be the duty of every officer, board, commission, commissioner, department or institution brought within the provisions of this act by section 1 hereof, to keep, in proper books, a detailed itemized account of all moneys received as aforesaid, and from what source, or sources, received. Every such officer, board, commission, commissioner, department or institution receiving money as aforesaid, shall, on or before the second

Wednesday of January, April, July and October of each year, file in the office of the Auditor of Public Accounts, a detailed statement of such receipts, verified by the oath, or affirmation, of such officer, or by the oath, or affirmation, of some officer or employee of the board, commission, commissioner, department or institution making and filing such statement, and shall, on such date, pay into the State treasury all moneys so received during the three calendar months next preceding. All moneys so paid into the State treasury shall, unless required by some statute to be held in the State treasury in a separate or special fund, be covered into the general revenue fund in the State treasury." (Laws of 1911, p. 429.)

These two sections were amended in 1921 so as to read as follows:

"Sec. 1. The officers of the executive department of the State government, the clerk of the Supreme Court, the departments of the State government created by 'An act in relation to the civil administration of the State government, and to repeal certain acts therein named,' approved March 7, 1917, in force July 1, 1917, and all other officers, boards, commissions, commissioners, departments, institutions, arms or agencies of the executive department of the State government, the University of Illinois excepted, are subject to the provisions of this act.

"Sec. 2. It shall be the duty of every officer, board, commission, commissioner, department, institution, arm or agency brought within the provisions of this act by section 1 hereof to keep in proper books a detailed itemized account of all moneys received for or on behalf of the State, showing the date of receipt, the payee, and purpose and amount, and the date and manner of disbursement as hereinafter provided, and shall pay into the State treasury the gross amount of money so received without delay not later in any event than thirty days after the receipt of same, without any deduction on account of salaries, fees,

costs, charges, expenses or claims of any description whatever. No money belonging to or left for the use of the State shall be expended or applied except in consequence of an appropriation made by law and upon the warrant of the Auditor of Public Accounts. Every such officer, board, commission, commissioner, department or institution receiving money as aforesaid shall, on or before the second Wednesday of January, April, July and October of each year, file in the office of the Auditor of Public Accounts a detailed balanced statement of such receipts for the preceding fiscal quarter showing dates of remittances verified by the oath or affirmation of such officer making and filing such statement. All moneys so paid into the State treasury shall, unless required by some statute to be held in the State treasury in a separate or special fund, be covered into the general revenue fund into the State treasury." (Laws of 1921, p. 586.)

The amendatory act added sections 2a and 2b and amended section 4 of the act of 1911, but these sections are of no importance in this case.

Clearly, under these statutes all money received for the use of the State was required to be deposited within thirty days after its receipt, without deduction, in the State treasury, from which it could not be withdrawn except by means of an Auditor's warrant issued against an appropriation made by the General Assembly. It is beyond question that the statute established a rule which had no exception in favor of any officer, commission, board or institution, except the University of Illinois. The opinion adopted refers to the passage in 1917 by the Fiftieth General Assembly of the Civil Administrative Code, and the enumeration of the several departments of the State government as designated in section 3 of that code, (Laws of 1917, p. 2,) and calls attention to the fact that the code did not include the State militia nor the Adjutant General in the division of officers, commissions, boards and departments of the State. The

opinion also refers to the fact that section 1 of the act of 1911, as amended in 1921, provided that the officers of the executive department of the State government, the clerk of the Supreme Court, the departments of the State government created by the Civil Administrative Code, and all other officers, boards, commissions, commissioners, departments, institutions, arms or agencies of the executive department of the State government, the University of Illinois excepted, are declared to be subject to the provisions of the act, and further states that it will be observed that these amendments designated who should be the officers of the executive department of the State government, and that the Adjutant General was not included in that list. The inference was apparently intended to be drawn from the failure to name the Adjutant General, that he was not intended to be subject to the provisions of the act. The Civil Administrative Code, by section 2, defined the word "department," as used in the act, to mean, unless the context otherwise clearly indicates, "the several departments of the State government as designated in section 3 of this act, and none other." No such inference can be drawn from the omission of the Adjutant General from the list of officers mentioned in the code. It did not purport to name all the officers of the State government. It did create certain offices in each department created by the code, but it did not purport to abolish all officers not mentioned in the code. Section 35 did not designate who should be the officers of the executive department of the State government. It did abolish many offices, boards, commissions, arms and agencies of the State government which had theretofore been created by law and were named in that section, but it did not purport to abolish other offices, arms or agencies of the State government not named in the act. Sections 1 and 2 of the act of 1911 continue to be in force as to all officers, arms, agencies and departments of the State government which were not abolished by the Civil Administrative Code,

as well as to all departments, institutions, officers, arms and agencies of the State government created by that code. The Adjutant General continued to be an officer and the State militia an arm and agency of the State government, as they had been before the Civil Administrative Code was passed, and were subject to the act of 1911 as much after that code became the law of the State as before. The language of sections 1 and 2, as amended by the act of 1921, was as comprehensive and inclusive of all officers, boards, commissions, commissioners, departments, institutions, arms or agencies of the executive department of the State government, the University of Illinois excepted, as it was before the code was enacted and as completely subject to the provisions of the act of 1911 as amended by the act of 1921. The only institution, arm or agency of the executive department of the State government excepted from the operation of the act as amended is the University of Illinois. The General Assembly may have the power to create other exceptions, but the question here is, Has it created an exception in this case? The question is therefore one of statutory construction and not of constitutional interpretation.

As stated in the opinion, until the enactment in 1931 of section 3½ of article 18 of the State Militia act no express authority existed for renting a State armory to anyone. The Forty-seventh General Assembly in 1911 passed an act in relation to the procuring of sites and for the erection of armory buildings for the use of the Illinois National Guard and the Illinois Naval Reserve and making an appropriation therefor. The act constituted a commission, consisting of the Adjutant General, division commander and the regimental commanders of the organizations for which armories were to be erected as provided in the act, with full power to carry out its provisions. The duty was imposed upon the commission to meet and organize, to select suitable sites, and procure, in the name of the State, title to each of the sites so selected, for the erection of five armories for the

use of certain organizations of the Illinois National Guard and Illinois Naval Reserve—two at Chicago, one at Quincy, one at Aurora and one at Woodstock—and placed the general management, control and supervision of all matters pertaining to the erection and construction of said armories and the making and letting of all contracts necessary for it fully to construct, build and erect the armories. Appropriations were made for securing sites and for the erection of the armories to the amount of $395,000, for which the Auditor was authorized and directed to draw his warrant on the Treasurer upon the presentation of proper vouchers certified by the Adjutant General and approved by the Governor. Other appropriations have been made for the construction of armories in various places throughout the State, and the armories have been constructed. Section 3½ was passed for the purpose of authorizing the use of these armories, subject to such reasonable regulations as might be promulgated by the Adjutant General, for reasonable and legitimate civilian activities so long as such activities do not interfere with the use of the armories for military purposes, and it provided that any proceeds received, above the expenses incident to such use, should be placed in an armory fund. It authorized the receipt of compensation for such use. The Adjutant General is given general supervision of the State arsenal and armories and the grounds and buildings of all military camps and rifle ranges. He is the proper authority to receive the proceeds from the use of the armories under section 3½, personally or through his assistants or the commander of the armory or other designated officer or custodian. When money, the proceeds received for the use of the armory for civilian activities, is received it is public money of the State and becomes subject to the act in relation to the payment of the public money of the State into the State treasury unless it is exempted from the terms of that act by section 3½ in question. The section does not expressly except it from the

operation of the statute. The provision in regard to the proceeds is, that the amount received above the expenses incident to such civilian use may (which must be construed "shall") be placed in an "armory fund" and used for the purposes stated, "for the benefit of the members of the company or companies at the particular armory." There is nothing in the act which requires or authorizes the money to be placed in any other custody than that which the statute already specified when it directed that the gross amount of all money received for or on behalf of the State should be paid into the State treasury without delay, not later, in any event, than thirty days after its receipt.

Where there are two affirmative statutes, or two affirmative sections in the same statute upon the same subject, the rule of construction is that the one does not repeal the other if both may stand together, and the provisions of a statute should receive such interpretation, if the words and subject matter would admit of it, that the existing rights of the public or of individuals be not impaired. (*Bruce* v. *Schuyler,* 4 Gilm. 221.) The doctrine of repeal by implication is not favored in law and is never resorted to except where the repugnancy is too clear and plain to be reconciled. The rule of law is that all laws *in pari materia* are to be construed together, and that no clause, sentence or word of any law shall be superfluous or insignificant. It is a familiar doctrine that the earlier statute continues in force unless the two acts are clearly inconsistent with and repugnant to each other, or unless in the later statute some express notice is taken of the former plainly indicating an intention to repeal it. (*Town of Ottawa* v. *County of LaSalle,* 12 Ill. 339; *Holton* v. *Daly,* 106 id. 131.) Though two acts are seemingly repugnant, they should, if possible, be so construed that the later act may not operate as a repeal of the earlier by implication. (*People* v. *Raymond,* 186 Ill. 407; *Fowler* v. *Pirkins,* 77 id. 271.) In the interpretation and construction of statutes the purpose

and intent of the legislature when the act was passed must be ascertained and given effect if possible, and in ascertaining such purpose and intent it is proper to consider the history of the legislation on the subject enacted at the same or different sessions and to consider statutes upon cognate subjects though not strictly *in pari materia.* (*People* v. *Barnett,* 319 Ill. 403.) Where a later statute is enacted which has some relation to the same subject, the earlier will continue in force unless the two are clearly repugnant to each other, and where they are seemingly repugnant the later act will not be held to repeal the former unless the two are so inconsistent that it is impossible that both should stand. The court will adopt any reasonable construction to prevent a repeal by implication. *Village of Glencoe* v. *Hurford,* 317 Ill. 203; *People* v. *Burke,* 313 id. 576; *Town of Ottawa* v. *County of LaSalle, supra.*

There is no inconsistency between the two acts here. The act in relation to the payment of the public money of the State into the State treasury, as amended in 1921, definitely declares the rule that all money of the State received by any of its officers shall be paid into the State treasury without delay. The additional section 3½ makes legal the use of the armory for the purposes stated and the receipt of money for such purposes. The money is the money of the State and comes under the terms of the act requiring its payment into the State treasury. It is not in any degree inconsistent with the payment of this money into the State treasury that the amount so paid into the treasury above the expenses incident to the civilian use of the armory shall be placed in an armory fund and used for the purposes mentioned in section 3½. There are many special funds which are directed to be kept in the State treasury, one of which is the State military fund, comprising all moneys arising from the sale of damaged or surplus military stores and property or from stores or property sold to the United States, which section 29 of article 6

of the military code requires shall be turned into the State treasury and shall constitute a fund to be known as the "State military fund," to be kept separate from other funds and paid out by the Treasurer for general military purposes on proper vouchers certified by the Adjutant General and approved by the commander in chief. Other special funds required to be maintained in the State treasury are the fire prevention fund, the University of Illinois fund, the Illinois-Michigan canal fund, the common school fund, the road fund, Federal aid road fund, waterway fund, the State bond road fund and the working fund, and all money belonging to or for the use of the State paid into the treasury, not belonging to any special fund in the State treasury, is declared to constitute the general revenue fund. All these funds are provided for by the act in relation to State finances. Cahill's Stat. 1931, p. 2643; Smith's Stat. 1931, p. 2792.

It is argued in behalf of the appellees that if it was the intention of the General Assembly that the moneys received for the use of the armory should be placed in the treasury there was no need of the second sentence of the section, for it had already been provided for by the act of June 9, 1911, that the moneys should be paid into the treasury, and unless this second sentence provides a different method of handling armory rentals from that in previous use the second sentence adds nothing to the statute. This argument overlooks the last sentence of the second section of the act in relation to the payment of the public money into the State treasury, providing that "all moneys so paid into the State treasury shall, unless required by some statute to be held in the State treasury in a separate or special fund, be covered into the general revenue fund into the State treasury." The manifest object of the second sentence of section 3½ was to require the proceeds from civilian uses of the armory to be kept in a special fund and used for the purposes mentioned in the section,

"in the interest and for the benefit of the members of the company or companies at the particular armory," instead of becoming a part of the general revenue fund. This, of course, does not mean for the individual pecuniary benefit of the different members, but does mean for the benefit of all the members collectively, constituting an organized body.

Reference is also made to what is said to be the well known practice which had been in existence for many years not only to permit the use of the armories by civilians, but to use the proceeds derived from such use in such a way as to be for the interest of recruiting and the welfare of the military units. It may be that such a practice has existed, though nothing to indicate it appears in the record. Assuming it to be so, there is no claim that any authority of law existed for such practice, and that was certainly the view of the General Assembly, otherwise the passage of the additional section would not have been deemed necessary. It is clear that the only intention of the General Assembly in passing that section was to make legal such use of the armory and that it was deemed advisable that the sums so received should be paid into the State treasury under the general law, which requires every agency of the executive department of the State, except the University of Illinois, to pay all money received for or on behalf of the State into the State treasury, and that those sums should constitute a special fund in the treasury, for the purposes mentioned in additional section 3½, to be paid out upon appropriation only for such purposes upon warrants drawn by the Auditor upon vouchers duly certified as required by law.

In my judgment it was error for the court to sustain the demurrer to the bill, for which the decree should be reversed and the cause remanded.

DUNCAN and DeYOUNG, JJ., concur in this dissenting opinion.