(No. 38106.—

Gale Williams, Appellant, *vs.* Otto Kerner, Governor, Appellee.

*Announced orally Nov. 13, 1963.—Opinion filed Dec. 10, 1963. Rehearing denied Jan. 4, 1964.*

House and Underwood, JJ., dissenting.

Mitchell & Green, of Murphysboro, for appellant.

William G. Clark, Attorney General, of Springfield, (William C. Wines, Raymond S. Sarnow, Richard A. Michael, and Edward A. Berman, Assistant Attorneys General, of counsel,) for appellee.

Mr. CHIEF JUSTICE KLINGBIEL delivered the opinion of the court:

In June, 1963, the General Assembly adopted and sent to the Governor a bill redistricting the State into 59 districts for the purpose of electing State representatives. On July 1, the Governor vetoed the bill. Gale Williams, a State representative, thereupon brought the present action in the circuit court of Sangamon County to declare the veto void. By stipulation the cause was submitted on the pleadings, and after argument of counsel judgment was entered in favor of defendant. The plaintiff appeals directly to this court, a construction of the constitution being involved.

The question is whether a reapportionment or redistricting for the purpose of electing State representatives is within the veto power. The plaintiff argues that this kind of action by the General Assembly is not a "bill," within the meaning of section 16 of article V of the constitution, requiring every bill passed to be presented to the Governor, and that under a proper construction of the applicable constitutional language the duty to reapportion is imposed solely upon the legislature. Defendant contends that the constitution reveals no intention to vary the normal procedure in cases of reapportionment legislation, and that while there are no Illinois decisions directly in point, the Governor's veto power with respect to such legislation is indicated both by authority from other jurisdictions and by the past practice in Illinois.

The constitutional provisions for redistricting are found in sections 6, 7 and 8 of article IV, as amended in 1954. Section 7 directs that "The General Assembly in 1955 and in 1963, and every ten years thereafter, shall redistrict the state for the purpose of electing state representatives. Section 8 provides that "In performing its duties under Sections 6 and 7 of this amendment, the General Assembly shall redistrict and reapportion in a single legislative enactment," and that if it fails to redistrict by July 1, the redistricting shall be

accomplished by a commission appointed in the manner therein specified. If the commission fails to perform within four months of its appointment all State representatives are to be nominated and elected at the next election from the State at large. It is further provided that "Following such an election at large, the General Assembly at its next regular session shall perform the duties specified in this amendment."

The plaintiff argues that in referring to the redistricting as "its duties" (namely the General Assembly's duties) and in using the words "a single legislative enactment" the constitution discloses an intention that the Executive should have no part in creating these districts. We do not think the language in question can be given any such interpretation. It is undisputed that prior to the 1954 amendment there had been a number of reapportionments and that in each case the measure had been submitted to the Governor for approval. If there had been an intention to change this custom in 1954 it would have been expressed in clear and unmistakable terms. It would hardly have been left to inference from language such as that relied upon by the plaintiff.

Although the practice has been to submit these measures to the Governor, the question whether such is required by law has not heretofore been decided in this State. The general problem has been considered elsewhere, however, with conclusions similar to that reached by the circuit court. The principal authority, relied upon by both parties, is *Smiley* v. *Holm,* 285 U.S. 355, 76 L. ed. 795. In that case the Governor of Minnesota vetoed a measure redistricting the State for congressional election purposes. The bill was not repassed by the required two-thirds vote but was merely deposited with the Secretary of State. An action was thereafter brought to declare invalid certain nomination filings and election notices based upon the congressional districts as so formed. In affirming a judgment for defendant the

State Supreme Court held that the legislature was not acting in the exercise of lawmaking power but merely as an agency of the people, discharging a particular duty in the manner required by the Federal constitution, and that the Governor's veto power had no relation to such matters. On further review, however, the United States Supreme Court rejected this view. It held that the constitution (U.S. Const., art I, sec. 4), in providing that "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof * * *", contemplates the function of making laws, and that the measure in question was subject to the Governor's veto power as a part of the legislative process. Having been vetoed, the bill was ineffective to redistrict the State.

Plaintiff seeks to distinguish the *Smiley* case on the ground that the constitutional provision involved there granted authority to provide a complete code for congressional elections, rather than a bare redistricting as in the case at bar, and that in concluding it contemplated the exercise of law-making power the United States Supreme Court relied upon this as the distinguishing feature. Although the distinction does exist, we do not think it follows that a contrary result is called for in this case. As we have indicated, there is nothing in the constitutional language involved here to indicate that anything but a legislative function is contemplated. And when engaged in considering bills the Governor is acting in a legislative capacity. For that purpose he is a part of the legislative department. (See *Fergus* v. *Russel,* 270 Ill. 304, 349-350.) It follows that the veto power is applicable.

The conclusion is in accord, also, with *Koenig* v. *Flynn,* 285 U.S. 375, 76 L. ed. 805, which decided, on authority of the *Smiley* case, that a concurrent resolution of the senate and assembly of the State of New York establishing new congressional districts was ineffective for want of the

Governor's approval, with the Florida Supreme Court's *Advisory Opinion to the Governor*, 81 So.2d 782, wherein constitutional provisions similar to our own were construed to contemplate that apportionment bills take the same course as other legislation insofar as the veto power is concerned, and with *State ex rel. Broughton* v. *Zimmerman*, 261 Wis. 398, 52 N.W.2d 903, which involved a 1951 act reapportioning legislative districts of Wisconsin. The applicable section of the Wisconsin constitution provided that "At their first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants, excluding Indians not taxed, soldiers, and officers of the United States army and navy." In rejecting a number of objections to the validity of the reapportionment act the court observed "The power and duty imposed upon the legislature by the constitution to reapportion the state after each federal census can only be exercised by both the houses of the legislature passing a bill that becomes a law upon the signature of the governor and publication, or, if the governor should veto it, upon repassage by the required vote over his veto, and publication."

Further support for a like interpretation in this case is found in the fact that previous redistricting bills, under substantially the same constitutional language, have been submitted to the Governor for his approval. As the United States Supreme Court pointed out in the *Smiley* case "General acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubts as to its meaning. This is especially true in the case of constitutional provisions governing the exercise of political rights and hence subject to constant and careful scrutiny." This language is equally applicable to the provisions involved here.

Not only is there a failure to negative the veto power, in the face of long recognized practice under predecessor provisions, but express recognition of its applicability under present provisions was given by the Illinois Committee for Constitutional Revision, whose activities were so instrumental in securing the amendment's adoption and implementation. Thus at the 1955 session of the General Assembly a proposed map, rejected after protest by the Committee, was replaced by a second objectionable one, whereupon "The Illinois Committee for Constitutional Revision again protested and urged the Governor to use his good offices to correct the disparities, and if that could not be done *to veto the entire legislation.*" (Report on the Campaign for the Passage of the Reapportionment Amendment, Appendix "E", entitled "Post Election History of Blue Ballot Reapportionment Amendment", p. 2. Emphasis supplied.) That the veto power is applicable is shown, therefore, by past practice, by authority, and by contemporaneous construction. The Governor did not exceed his authority in exercising it.

The circuit court was correct in dismissing the complaint. Its judgment is accordingly affirmed.

*Judgment affirmed.*

Mr. Justice House, dissenting:

I respectfully dissent. Rehearing should have been granted in this case and it should be consolidated for opinion with *People ex rel. John W. Spence et al.,* Petitioners v. *Charles F. Carpentier et al.,* Respondents, *post,* p. 43, and *People ex rel. Giannis,* Petitioner v. *Charles F. Carpentier et al.,* Respondents, *post,* p. 24. While the specific issues in each case are different, the operative facts giving rise to the issues all involve the ultimate question of the territory from which State representatives are to be elected.

I am of the opinion that the general veto powers of the Governor in section 16 of article V of the constitution do

not extend to the "legislative enactment" contemplated by section 8 of article IV. Approval of sections 6, 7 and 8 of article IV arose out of the frustration of the people who were entitled to reapportionment but were unable to secure it for 50 years. It seems apparent that the framers of the reapportionment amendment were determined to put teeth into the amendment of such a unique and compelling quality that the mandate could not be ignored.

First, the history of the events leading up to the adoption of the 1954 reapportionment amendment to the constitution of Illinois, being amended sections 6, 7 and 8 of article IV, indicates to me that the intent of the reapportionment amendment was to coerce the legislature into enacting a reapportionment law every 10 years and that no obstacle which would tend to prevent such a reapportionment law was contemplated.

Section 6 of article IV of the constitution of 1870 provided that every 10 years beginning with 1871 the General Assembly should apportion the State based on a population formula set out in the section. The legislature last obeyed this constitutional mandate by the reapportionment act of 1901. In the ensuing years the population increase in Cook County was much greater than it was outside of Cook County. A reapportionment under section 6 of article IV of the constitution of 1870 would have given control of both houses of the legislature to population-heavy Cook County. Numerous attempts were made to force the legislature to obey the constitutional mandate to redistrict, but the courts consistently held that they were without power to make the legislature perform its constitutional duty. *Colegrove* v. *Green*, 328 U.S. 549, 90 L. ed. 1432; *People ex rel. Fergus* v. *Blackwell*, 342 Ill. 223; *Fergus* v. *Kinney*, 333 Ill. 437; *Fergus* v. *Marks*, 321 Ill. 510.

In *Colegrove* v. *Green*, 328 U.S. 549, which involved the failure of the Illinois legislature to reapportion under section 6 of article IV of the constitution of 1870, the

Supreme Court stated, "Of course no court can affirmatively re-map the Illinois districts so as to bring them more in conformity with the standards of fairness for a representative system. At best we could only declare the existing electoral system invalid. The result would be to leave Illinois undistricted and to bring into operation, if the Illinois legislature chose not to act, the choice of members for the House of Representatives on a state-wide ticket. The last stage may be worse than the first. The upshot of judicial action may defeat the vital political principle which led Congress, more than a hundred years ago, to require districting. This requirement, in the language of Chancellor Kent, 'was recommended by the wisdom and justice of giving, as far as possible, to the local subdivisions of the people of each state, a due influence in the choice of representatives, so as not to leave the aggregate minority of the people in a state, though approaching perhaps to a majority, to be wholly overpowered by the combined action of the numerical majority, without any voice whatever in the national councils.' " (328 U.S. 549, 553.) The court concluded, "The remedy for unfairness in districting is to secure State legislatures that will apportion properly, or to invoke the ample powers of Congress. The Constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial action. * * * The Constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legisative action and, ultimately, on the vigilance of the people in exercising their political rights." 328 U.S. 549, 556.

The people of the State of Illinois did seek to exercise their political rights and in order to insure that the legislature would act, approved amended sections 6, 7, and 8 of article IV of the constitution at the general election on

November 2, 1954. The official statutory explanation of the proposed amendment given to the voters told them that "the apportionment amendment tends to assure the people of a constitutional districting because if the General Assembly fails to act, a commission is provided; and if the commission fails to act, legislators will be elected at large." Laws of 1953, p. 1929.

Secondly, the Governor's function in securing a reapportionment for purposes of electing State representatives is specifically set out in section 8 of article IV. It would seem that any other function that the Governor was to have in the reapportionment process would have been set out in like manner.

Section 8 provides in part that "If, however, the regular session of the General Assembly in 1955  *  *  *  or in 1963, or any 10 years thereafter  *  *  *  fails by the first day of July to redistrict the state into such districts, then the redistricting shall be accomplished by a commission. *  *  *  (T)he governor shall appoint the commission of 10 members,  *  *  *.

"This commission shall redistrict the state into senatorial districts and into representative districts in the manner specified above. This commission shall file with the secretary of state a full statement of the numbers of the senatorial and representative districts and their boundaries. No such statement shall be valid unless approved by 7 members of such commission.

"After such statement is filed, senators and representatives shall be elected according to the statement and the districts therein determined, until a redistricting and reapportionment are thereafter made by the General Assembly as provided in this amendment."

Thus, section 8 has in the first instance provided that the General Assembly shall reapportion the State in a single legislative enactment. If the legislature fails to obey this

constitutional mandate then the People have commanded that the duties be given to the executive branch of government, namely, a commission appointed by the Governor.

A third consideration which leads to my conclusion is that the General Assembly by the provisions of section 8 was required to act by July 1 of 1963. If it be assumed that legislative enactment as used in section 8 contemplates merely passage by the House and Senate by July 1 and that the Governor may veto this enactment on or after July 1, as the majority has held, then the Governor has been given an absolute veto. And yet, we have consistently held that the Governor's veto power under section 16 of article IV is merely a qualified veto. See, *e.g.*, *Board of Education of School District No. 41 v. Morgan*, 316 Ill. 143.

A fourth consideration relates to those provisions dealing with the commission appointed to reapportion the State for purposes of electing legislative representatives. The commission is to be chosen from a group of 20 persons selected from two political parties. They are responsible to no one for their actions and the Governor cannot veto their action. It seems strange that the elected representatives of the people are subject to the veto power of the Governor in carrying out their constitutional duties of reapportioning the State for purposes of electing State representatives, while a commission of 10 persons who are responsible to no one can create districts for the election of State representatives.

A fifth consideration which cannot be ignored is the practical effect of the Governor's veto. Reapportioning the State for purposes of electing State representatives is, of course, a highly political process. Under section 7 of article IV of our constitution there is a guarantee of minority representation in the House of Representatives to the extent that $\frac{1}{3}$ of the House shall be of the party opposite to the majority $\frac{2}{3}$. Since a $\frac{2}{3}$ vote of the House is required to overcome the Governor's veto the practical effect of a veto

is to prevent any reapportionment enactment which the Governor does not approve and gives him the right to appoint a commission. And yet, the people of the State have given preference to reapportionment to their duly elected representatives in the first instance and to the executive only if their duly elected representatives fail to act as had been the experience for more than 50 years prior to the 1954 constitutional reapportionment amendment.

All of the foregoing considerations lead me to the conclusion that the General Assembly was to reapportion the State for the purposes of electing State representatives without any participation by the Governor in the first instance and that only if the General Assembly failed to act by July 1, 1963 was the matter to be undertaken by the executive department. The cases from other jurisdictions which hold that the Governor shall participate in reapportionment enactments the same as he does in any other legislative enactment all deal with provisions materially different from the provisions found in our constitutional scheme for securing reapportionment, and are of no help here.

Even assuming that the Governor generally has the right to veto a reapportionment by the General Assembly, I am of the opinion that the Governor did not have the power of veto here. House Bill 978 was passed on June 27. The following day the Governor exercised his prerogative under section 9 of article V of the constitution and by proclamation adjourned the General Assembly.

On July 1 the Governor filed House Bill 978 together with his veto message in the office of the Secretary of State. This veto message commences in the following language: "I herewith file in your office without my approval House Bill 978 entitled, 'An Act to repeal Sections 6, 7 and 8 of and to add Sections 6.1, 7.1 and 8.1 to "An Act to apportion the State of Illinois into senatorial and representative districts and to repeal an Act herein named", approved June 28, 1955', *the General Assembly by its adjournment having pre-*

*vented the return of this Bill to the House in which it originated."*

It is to be noted that the italicized language of the Governor's veto message is in conformity with the last paragraph of section 16 of article V which provides "Any bill which shall not be returned by the Governor within ten days (Sundays excepted) after it shall have been presented to him, shall become a law in like manner as if he had signed it; *unless the General Assembly shall, by their adjournment, prevent its return, in which case it shall be filed with his objections in the office of the Secretary of State, within ten days after such adjournment, or become a law."* I believe that since return of the bill to the House in which it originated was not prevented *by the General Assembly adjourning itself,* but was prevented *by the Governor's adjournment of the General Assembly,* that he had no power to veto the bill.

A reading of the debates of the constitutional convention of 1870 throws no light on the meaning of the "unless" clause in the last sentence of section 16 of article V. There is no doubt, however, that the purpose of the clause is the same as the "unless" clause found in the second paragraph of section 7 of article I of the constitution of the United States. The last sentence there provides: "If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, *unless the Congress by their Adjournment prevent its Return,* in which Case it shall not be a Law."

The United States Supreme Court has interpreted these provisions of the United States constitution to have two fundamental purposes: "(1) That the President shall have suitable opportunity to consider the bills presented to him; and (2) That the Congress shall have suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite

votes." (*Wright* v. *United States*, 302 U.S. 583, 596, 82 L. ed. 439; see also *Edwards* v. *United States,* 286 U.S. 482, 76 L. ed. 1239.) In the *Pocket Veto Case,* (302 U.S. 583), the Supreme Court held that when the adjournment of Congress prevents the return of a bill, the failure of the bill to become a law is attributable solely to the action of Congress in adjourning before the time allowed the President for returning the bill had expired. It seems clear that if the General Assembly cannot prevent the Governor from exercising his right to veto legislation by adjourning and thereby preventing his return of the bill to the House in which it originated, that the Governor cannot by his adjournment of the General Assembly deprive them of that "suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite votes."

It may be argued that the General Assembly might not have been able to overcome the veto or that their action might have come after the July 1 deadline set out in section 8 of article IV of the constitution. The other side of the coin, however, is that another reapportionment bill, Senate Bill 83, had passed in the Senate and was pending in the House when the Governor prorogued the General Assembly on June 28. It is idle to speculate what the legislature would or could have done had the Governor not adjourned them before the July 1 deadline.

House Bill 978 was passed in both houses, it was presented to the Governor, and he did thereafter prorogue the legislature on June 28. Although the Governor showed his disapproval of the act and filed it in the office of the Secretary of State with the explanation that "the General Assembly by its adjournment having prevented the return of this Bill to the House in which it originated," the fact is that his prorogue on June 28 prevented the return of the bill to the House in which it originated. From the moment he prorogued the General Assembly, it was impossible to re-

turn the bill to the House where it originated and the Governor's veto thereafter would become absolute, not because of the legislature's adjournment but, because of his adjournment of the legislature.

I am of the opinion that the Governor by exercising his prerogative to prorogue the General Assembly under section 9 of article V precluded his power to veto House Bill 978 and find nothing in *People ex rel. Harless* v. *Hatch,* 33 Ill. 9, which would not support this conclusion.

In my opinion the petitions for writ of *mandamus* in *People ex rel. Spence* v. *Carpentier, post,* p. 43, and *People ex rel. Giannis* v. *Carpentier, post,* p. 24, should be denied and the judgment herein should be reversed.

Mr. JUSTICE UNDERWOOD, also dissenting:

I share the misgivings of Mr. Justice House as to whether the gubernatorial veto power can be construed to embrace the legislative duty to reapportion as provided in section 8 of article IV, and, on that basis, would join in reversal of the judgment herein.