(Nos. 83491, 83492, 83662 cons.—)

STEPHEN GRAHAM *et al.*, Appellees, v. THE IL-
LINOIS STATE TOLL HIGHWAY AUTHORITY
*et al.*, Appellants.

*Opinion filed March 19, 1998.—Rehearing denied June 1, 1998.*

James E. Ryan, Attorney General, of Springfield (George J. Sotos, David A. Wilson and Brian K. Farley, Assistant Attorneys General, of Downers Grove, and C. Richard Johnson and Ruth E. Krugly, Special Assistant Attorneys General, of Schiff, Hardin & Waite, of Chicago, of counsel), for appellant Illinois State Toll Highway Authority.

Terry F. Moritz, David J. Chizewer and Roger A. Lewis, of Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., of Chicago, for intervenor-appellant First National Bank of Chicago.

Myron M. Cherry, of Cherry & Flynn, and Lee J. Schwartz, both of Chicago, for appellees.

Thomas P. Conley and Alan I. Becker, of Burditt & Radzius, Chrtd., of Chicago, for *amicus curiae* Illinois Educational Facilities Authority.

William F. Conlon and Richard W. Astle, of Sidley & Austin, of Chicago, for *amicus curiae* Illinois Health Facilities Authority.

Jeremiah Marsh, Christopher N. Knight, Joe Ourth and John L. Rogers, of Hopkins & Sutter, of Chicago, for *amicus curiae* Illinois Housing Development Authority.

William D. Heinz, Russell J. Hoover, Barry Levenstam and Jason C. Turner, of Jenner & Block, of Chicago, for *amici curiae* University of Illinois *et al.*

Courtney C. Nottage, of Chicago, for *amicus curiae* Minority Leader of the Illinois Senate.

Michael J. Kasper, of Chicago, for *amicus curiae* Speaker of the Illinois House of Representatives.

Susan Getzendanner and Paula M. Stannard, of Skadden, Arps, Slate, Meagher & Flom, of Chicago, for *amicus curiae* Village of Long Grove.

JUSTICE BILANDIC delivered the opinion of the court:

At issue in this case is the constitutionality of sections 24 and 25 of the Toll Highway Act. These provisions set forth the procedure for spending of toll highway revenues by the Toll Highway Authority. 605 ILCS 10/24, 25 (West 1996). This spending scheme has been in force, in substantially its present form, since 1953 and was held constitutional by this court under the Illinois Constitution of 1870. We are here called upon to determine whether this method of spending withstands scrutiny under the Illinois Constitution of 1970. We now hold that the method of spending set forth in the Toll Highway Act does not violate the 1970 Constitution.

FACTS

The Illinois State Toll Highway Authority (the Authority) was established by the Toll Highway Act in 1967. 1967 Ill. Laws 2748 (eff. April 1, 1968). The Authority is the successor to the Illinois State Toll Highway Commission, which had been established by statute in 1953. 1953 Ill. Laws 1314 (eff. July 13, 1953). Insofar as pertains to this appeal, the 1967 statute is substantively the same as the 1953 statute, except that the term "Authority" is substituted for "Commission."

The Authority is "an instrumentality and an administrative agency of the State of Illinois" created to

finance, construct, operate and maintain a system of toll highways through and within the State of Illinois. 605 ILCS 10/1, 8 (West 1996). The Authority consists of 11 directors, two of whom are the Governor and the Secretary of Transportation, *ex officio*, and the remainder of whom are appointed by the Governor with the advice and consent of the Senate. 605 ILCS 10/3 (West 1996). The Toll Highway Act also creates an advisory committee, composed of 7 members of the House of Representatives appointed by the Speaker, 7 members of the Senate appointed by the President, and 15 members appointed by the Governor. The advisory committee advises the Authority on all matters relating to policy and the administration of the toll highway system. 605 ILCS 10/3.1 (West 1996).

The Toll Highway Act grants the Authority the power to, *inter alia*: acquire, own, use and dispose of real and personal property; enter into contracts; employ and discharge employees; retain special counsel; and make and repeal resolutions, by-laws, rules, rates and regulations. 605 ILCS 10/3, 8 (West 1996). The Authority is also empowered to fix the rate for tolls for the privilege of using the toll highways. The tolls are to be set at the lowest reasonable rates that will provide sufficient funds for the operations and debt service of the Authority. 605 ILCS 10/10, 19 (West 1996). The Toll Highway Act further grants the Authority the power to issue bonds for any lawful purpose to be paid solely out of the revenues of the Authority. 605 ILCS 10/17 (West 1996). Prior to issuing bonds for a proposed toll highway, the Authority must hold a public hearing, submit preliminary plans to the Governor for his approval, and obtain authorization by joint resolution of the General Assembly. 605 ILCS 10/14.1, 14.2 (West 1996). All bonds issued by the Authority must state on their face that they do not represent a debt of the State of Illinois and

are payable solely from the revenues of the Authority. 605 ILCS 10/17(h) (West 1996). The Toll Highway Act further provides that, if any funds are appropriated to the Authority by the General Assembly, the Authority must repay those funds to the state treasury. 605 ILCS 10/18 (West 1996). When all bonds and other obligations of the Authority have been paid, or a sufficient amount for payment has been set aside in trust, and all money appropriated by the General Assembly has been repaid to the state treasury, the toll highways shall become a part of the state free highway system and the Authority shall be dissolved. 605 ILCS 10/21 (West 1996).

The Toll Highway Act also requires the Authority to file an annual report covering its activities for the preceding calendar year, an annual capital plan and a 10-year capital plan. In addition, the Auditor General is required to annually audit the books and records of the Authority and to file a certified copy of that audit with the Governor and the Legislative Audit Commission, to be open to public inspection. 605 ILCS 10/23 (West 1996).

The provisions of the Toll Highway Act at issue in this appeal, sections 24 and 25, set forth the Authority's spending power. 605 ILCS 10/24, 25 (West 1996). In pertinent part, section 24 provides that all moneys received by the Authority shall be paid to the state treasurer to be held as a special fund known as the Illinois State Toll Highway Authority Fund (the Toll Fund). The moneys in the Toll Fund are to be disbursed on the order of the Authority for the purposes provided in the Act. Section 24 states that the Toll Fund is to be considered "always appropriated" for the purposes of such disbursements. 605 ILCS 10/24 (West 1996). Section 25 provides for the expenses of the Authority and the compensation of its members to be paid from the proceeds of bond issues or the revenues received by the Authority. 605 ILCS 10/25 (West 1996).

According to the record, the Authority has approximately $980 million in revenue bonds outstanding. The bonds are secured under various trust indentures. The trustee is the First National Bank of Chicago (the Bank).

The plaintiffs, Stephen Graham, William DeWoskin and Manuel Kramer, purporting to represent the class of users of the toll highway system, filed this action for injunction and declaratory relief in the circuit court of Cook County in September 1995. The complaint named the Authority, Treasurer Judy Baar Topinka, and Comptroller Loleta Didrickson as defendants. The Bank was granted leave to intervene by the circuit court. The plaintiffs' second-amended complaint contained five counts. Only count II is the subject of this appeal. Count II alleged that, in violation of section 2 of article VIII of the 1970 Constitution, the Governor had not budgeted, and the General Assembly had not appropriated for, any expenditures of funds by the Authority for fiscal year 1996. Count II sought to enjoin the Authority from spending money "unless and until there is a valid appropriation" to the Authority.

The circuit court denied the Authority's motions for dismissal and for judgment on the pleadings as to count II, and ruled that the provisions of the Toll Highway Act which authorize spending without an annual appropriation violate the Illinois Constitution of 1970. The plaintiffs moved for a preliminary injunction preventing the defendants from making any payments out of the toll funds "other than to make payments of principal and interest on outstanding bonds issued by [the Authority] or such other payments necessary for maintaining the public health and safety, as may be ordered by the Court." The circuit court denied the plaintiffs' motion for a preliminary injunction in the form requested by the plaintiffs. Instead, the court granted a

preliminary injunction enjoining the defendants from processing any warrant or paying any expense of the Authority or making any disbursement on behalf of the Authority, other than debt service. The circuit court's preliminary injunction order stated that it was stayed until December 15, 1997. The order further provided that "[i]f any party can demonstrate that an appropriation for the Authority, which complies with the requirements of article VIII of the 1970 Constitution, has been enacted providing authority for expenditures by the Authority, the court will vacate the injunction."

The Authority and the Bank appealed directly to this court pursuant to Supreme Court Rule 302(a) (134 Ill. 2d R. 302(a)). The plaintiffs filed an appeal to the appellate court, pursuant to Supreme Court Rule 307(a), from the denial of the preliminary injunction in the form requested by the plaintiffs. That appeal was subsequently transferred to this court and consolidated with the Authority's and the Bank's appeals. We allowed the Illinois Health Facilities Authority, the Illinois Educational Facilities Authority, the Illinois Housing Development Authority, and the University of Illinois, Southern Illinois University and Northern Illinois University to file *amicus curiae* briefs on behalf of the defendants, and the Village of Long Grove and Michael J. Madigan, Speaker of the Illinois House of Representatives, and Emil Jones, Jr., Minority Leader of the Illinois Senate, to file *amicus curiae* briefs on behalf of the plaintiffs. 155 Ill. 2d R. 345. On November 25, 1997, this court entered an order staying the circuit court's preliminary injunction order until further order of this court.

The Authority has filed a motion to strike the plaintiffs' cross-appellants' reply brief. That motion was taken with the case. We now grant that motion in part. The portion of the plaintiffs' cross-appellants' reply brief that contains argument that is not confined to the

plaintiffs' cross-appeal is stricken. See 155 Ill. 2d R. 343(b)(1) (cross-appellant's reply brief must be confined strictly to replying to the cross-appellee's arguments on the cross-appeal). The portion of the cross-appellants' reply brief that is confined to the cross-appeal stands.

## ANALYSIS

The issue presented in this appeal is whether the method of spending authorized in sections 24 and 25 of the Toll Highway Act violates the Illinois Constitution of 1970. Those sections provide, in pertinent part, as follows:

"§24. Except as otherwise provided in any bond resolution, the proceeds derived from the sale of bonds, and all receipts and income derived from tolls, licenses, gifts, donations, concessions, fees, rentals, and all other revenues from whatever source derived, shall, within three days after receipt thereof, be paid to the Treasurer of the State of Illinois, and held by him as a special fund known as the Illinois State Toll Highway Authority Fund, except that the Authority may retain portions of the Illinois State Toll Highway Authority Fund as a locally maintained construction fund revolving account and as a revenue fund revolving account, where authorized by a bond resolution, and as locally maintained change funds, where necessary for the operations of the Authority. The State Treasurer shall be ex officio custodian of such special fund, which fund shall be held, invested and disbursed for the purposes provided herein upon the order of the Authority and in accordance with provisions and covenants of any bond resolution authorizing the issuance of bonds which have not been paid or deemed paid. *** Said special fund shall be considered always appropriated for the purposes of disbursements, as provided in this Act, and shall be paid out and disbursed only as provided herein, and shall not, at any time be appropriated or diverted to any other use or purpose." 605 ILCS 10/24 (West 1996).

"§25. After the issuance of revenue bonds to finance the construction of toll highways, and repayment from the

proceeds of such bonds of any amount repayable to the state treasury pursuant to Section 18, the expenses of the Authority, and the compensation of the members thereof, and all other costs of said toll highways and its administration and operation shall be paid from the proceeds of such bond issues or from the moneys received by the Authority as tolls or otherwise in the operation of said toll highways." 605 ILCS 10/25 (West 1996).

The plaintiffs argue that these provisions are unconstitutional because they permit the Authority to spend money without an annual legislative appropriation as required by the 1970 Constitution. The Authority and the Bank, on the other hand, contend that the legislature acted within constitutional bounds when it authorized the Authority to spend its revenues for the purposes specified in the Act without an annual legislative appropriation.

This court has previously considered the constitutionality of the method of spending set forth in the toll highway legislation. In *People v. Illinois Toll Highway Comm'n*, 3 Ill. 2d 218 (1954), this court upheld various aspects of the predecessor statute to the Toll Highway Act against challenges based upon provisions of the 1870 Constitution. In particular, this court rejected a constitutional challenge to the statute's spending scheme. The predecessor statute's spending provision was identical, in relevant part, to that contained in sections 24 and 25. Like the current statute, the predecessor statute provided that the revenues collected by the Commission were to be paid to the state treasurer and held by him as a special fund and disbursed upon the order of the Commission. Ill. Rev. Stat. 1953, ch. 121, par. 314a45. The plaintiff argued that this provision violated article IV, section 17, of the 1870 Constitution, which provided that "no money shall be drawn from the treasury except in pursuance of an appropriation made by law." In rejecting this argument, the court stated:

"[T]he section [of the toll highway legislation] complained of provides that moneys withdrawn from the State Treasury special fund shall be considered always appropriated for the purposes of disbursements and are to be paid out and disbursed only as provided in the act, which prohibits appropriations or diversions to any other use or purpose than specified. This, in effect, is an appropriation by the General Assembly. The income receipts from the operation of the contemplated toll highways are not a tax but a toll. It was held in *Green v. Black*, 352 Ill. 623, that the General Assembly's control of State revenues and finances is restricted only by our constitution and that the General Assembly may provide as to revenues other than State taxes and fees of State officers, that when such revenues are collected they may be appropriated to a use specified in the act. It was then declared that such is, in effect, an appropriation of such revenues to the purpose so specified." *Toll Highway Comm'n*, 3 Ill. 2d at 228-29.

The *Toll Highway Comm'n* decision also considered whether the predecessor statute violated a provision of the 1870 Constitution prohibiting the State of Illinois from being made a defendant in any court. Ill. Const. 1870, art. IV, § 26. The predecessor statute, like the current version, authorized suits for damages to be brought against the Commission. Ill. Rev. Stat. 1953, ch. 121, pars. 314a39, 314a52. In resolving this issue, this court reasoned that it must determine whether the Commission was a "mere department" of the state government or was an "independent legal entity." *Toll Highway Comm'n*, 3 Ill. 2d at 224. The court concluded that, although in many respects the Commission is "intimately associated with the regular organs of government," the "financial structure of the Commission is otherwise largely independent of the regular State government." As the court explained:

"The funds which [the Commission] obtains from the sale of bonds and from tolls are segregated and may be used only for toll highway purposes. Conversely, the State assumes no liability upon the bonds issued by the commis-

sion or upon any other contractual obligations which it incurs. Whatever effect a recovery of damages against the commission would have upon general, tax-derived revenues of the State is limited to the remote right which is given the State to receive any surplus remaining when the commission is ultimately dissolved." *Toll Highway Comm'n*, 3 Ill. 2d at 225.

This court concluded that subjecting the Commission to suit did not violate the constitutional prohibition on subjecting the state to suit. In so holding, the court relied primarily on the fact that "under no circumstances can the general funds of the State be reached in order to satisfy an obligation of the commission." *Toll Highway Comm'n*, 3 Ill. 2d at 227.

Based upon the *Toll Highway Comm'n* decision, the Authority contends that this court has already held that the method of spending contained in the Toll Highway Act meets constitutional requirements. The Authority argues that this decision should be controlling in this case. We agree that, were we still guided by the provisions of the 1870 Constitution, this court's decision in *Toll Highway Comm'n* would be controlling. The challenged spending structure of the current statute is virtually identical to that challenged in the *Toll Highway Comm'n* case. In that decision, this court expressly differentiated between the funds spent by the Toll Commission and the general funds of the state. This court went on to hold that, because the toll revenues were not state taxes or the fees of state officers, the General Assembly could constitutionally authorize the Authority to spend those revenues for the purposes specified in the statute without an annual legislative appropriation. In a later decision, this court clarified that the basis for the *Toll Highway Comm'n* holding was the character of the funds involved. In *Bowes v. Howlett*, 24 Ill. 2d 545, 548-49 (1962), the court addressed the constitutionality of a statutory provision containing a continuing ap-

propriation from the general revenues of the state. The court invalidated the provision because the 1870 Constitution prohibited continuing appropriations. In so holding, the court distinguished the *Toll Highway Comm'n* decision as follows:

> "There, the moneys involved were revenues to be derived from operation of the toll road facilities. Here, our comments thus far have been addressed to the $500,000 from general revenues of the State. General revenues are those derived from the imposition of taxes, fees, and all other revenues which constitute funds of the State [citations], *as distinguished from revenues collected by an authority from members of the public who use the facilities.* [Citations.] *The constitutional \*\*\* requirement of prior specific appropriation and provision for lapse of appropriations apply to the former but not the latter type of revenue.*" (Emphasis added.) *Bowes*, 24 Ill. 2d at 548-49.

Other statutes authorizing state-related entities to spend their own revenues without an annual appropriation were also upheld by this court under the 1870 Constitution. See, *e.g.*, *Green v. Black*, 352 Ill. 623, 626-27 (1933); see also *People ex rel. Kirk v. Lindberg*, 59 Ill. 2d 38, 40 (1974) (recognizing that "numerous decisions sustained the validity [under the 1870 Constitution] of expenditures from the State treasury without current appropriations").

Accordingly, our precedent is clear that the spending structure set forth in sections 24 and 25 of the Toll Highway Act did not violate the 1870 Constitution. The plaintiffs do not dispute this conclusion under the 1870 Constitution. The plaintiffs, however, contend that the Toll Highway Act's spending structure cannot withstand scrutiny under the Illinois Constitution of 1970. Specifically, the plaintiffs urge that section 2 of article VIII of the 1970 Constitution requires that the funds of the Authority be annually appropriated by the General Assembly.

Article VIII, section 2, of the 1970 Constitution provides as follows:

"(a) The Governor shall prepare and submit to the General Assembly, at a time prescribed by law, a State budget for the ensuing fiscal year. The budget shall set forth the estimated balance of funds available for appropriation at the beginning of the fiscal year, the estimated receipts, and a plan for expenditures and obligations during the fiscal year of every department, authority, public corporation and quasi-public corporation of the State, every State college and university, and every other public agency created by the State, but not of units of local government or school districts. The budget shall also set forth the indebtedness and contingent liabilities of the State and such other information as may be required by law. Proposed expenditures shall not exceed funds estimated to be available for the fiscal year as shown in the budget.

(b) The General Assembly by law shall make appropriations for all expenditures of public funds by the State. Appropriations for a fiscal year shall not exceed funds estimated by the General Assembly to be available during that year." Ill. Const. 1970, art. VIII, § 2.

The plaintiffs argue that, pursuant to section 2, the funds of the Authority must be both included in the Governor's budget and annually appropriated by the General Assembly before the Authority may disburse them.[1] Specifically, with regard to the appropriation provision, the plaintiffs contend that the Authority's

---

[1] The trial court found that the Authority is one of the entities whose funds must be included in the Governor's budget pursuant to section 2(a). The Authority does not dispute this ruling. The trial court did not, however, grant any relief to the plaintiffs on the basis of section 2(a); that is, the trial court did not order that the Authority was enjoined from making any disbursements unless such are included in the Governor's budget. Rather, the trial court enjoined disbursements until a legislative appropriation should be made. The plaintiffs do not ask this court to grant any relief based on the Governor's failure to include the Authority's funds in the budget. In any event, we note that the July 1997 Illinois State Budget Update includes budget information on the

revenues are public funds of the state which may be expended only pursuant to annual legislative appropriation. Under sections 24 and 25, however, the Authority is authorized to spend these funds without an annual appropriation by the General Assembly. The trial court agreed with the plaintiffs that sections 24 and 25 violate section 2(b) and enjoined the Authority from disbursing any funds which have not been appropriated by the General Assembly. The Authority and the Bank contend that section 2(b) was not intended to preclude the legislature from authorizing the method of spending contained in sections 24 and 25.

We must therefore determine whether the inclusion of section 2 in the Constitution of 1970 was intended to prohibit the legislature from authorizing the method of spending this court approved in the *Toll Highway Comm'n* decision. At this juncture, it is important to clarify the focus of our inquiry in this case. We are presented with a question regarding the scope of the *General Assembly's* power to enact a statute which allows a state-related entity to spend its revenues for specified purposes without an annual appropriation. There is no dispute that, if it should choose to do so, the General Assembly could amend the Toll Highway Act to require that all spending be made pursuant to annual legislative appropriation. In fact, the Authority being a creature of statute, the legislature has the power to impose whatever fiscal or other restrictions on the Authority's operations it chooses, subject to constitutional limita-

---

Authority. See Illinois State Budget Update, Illinois Bureau of the Budget, July 1997, 42-43. The plaintiffs do not contend that the information on the Authority's funds included in this budget update is insufficient to satisfy section 2(a). Accordingly, there is no need to address the effect of the Authority's absence from past gubernatorial budgets.

tions.[2] Accordingly, our inquiry here is not concerned with whether the legislature *should* alter the Authority's spending structure. To the contrary, we must determine whether the 1970 Constitution *requires* that the legislature annually appropriate for the Authority's spending. In sum, it is the power of the legislature, not the Authority, with which we are concerned. Further, "[i]t is well accepted in this State that the constitution is not regarded as a grant of powers to the legislature but is a limitation upon its authority; the legislature may enact any legislation not expressly prohibited by the constitution." *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 525 (1990); see also *Kluk v. Lang*, 125 Ill. 2d 306, 324 (1988).

Interpretation of a constitutional provision begins with the language of the provision. *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 13 (1996). If the language is unambiguous, it will be given effect without resort to other aids for construction. *Committee for Educational Rights*, 174 Ill. 2d at 13. If, however, the meaning of a provision is not clear from its language, it is appropriate to consult the debates of the delegates to the constitutional convention to ascertain the meaning they attached to the provision. *Committee for Educational Rights*, 174 Ill. 2d at 13; *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 493 (1984).

Accordingly, we begin our analysis with the language of section 2, set forth above. The Authority does not challenge the trial court's ruling that the Authority's funds must be included within the Governor's budget under section 2(a). The dispute in this appeal centers on

---

[2]We are cognizant of the fact that any legislative change to the structure or existence of the Authority may impact the rights of the holders of the Authority's outstanding bonds, and we do not address whether or how those rights must be considered should such a change be effected by the legislature.

whether section 2(b) requires that the Authority's funds be subject to the annual appropriations process. The plaintiffs contend that section 2(b) requires that all funds required to be included in the Governor's budget under section 2(a) must be included in the annual appropriations process. In contrast, the Authority and the Bank argue that section 2(b) does not require annual appropriations for all funds encompassed within the scope of section 2(a). In support of this position, they point out that section 2(a) expressly applies to "every department, authority, public corporation and quasi-public corporation of the State, every State college and university, and every other public agency created by the State," while section 2(b) applies only to expenditures by "the State." Thus, they argue, section 2(a) was intended to apply to a broader range of entities than section 2(b). They further contend that the narrow scope of section 2(b) was not intended to include the Authority because that section applies only to spending by "the State" and, as held in the *Toll Highway Comm'n* decision, the Authority is a separate entity from the state.

We find that the language of section 2(b) does not clearly indicate whether that section requires annual appropriations for spending of toll revenues by the Authority. It is therefore appropriate that we look to the drafting history of section 2(b) to discern the meaning of this provision. Our analysis of this history leads us to conclude that section 2(b) was not intended to preclude the legislature from authorizing the method of spending contained in sections 24 and 25 of the Toll Highway Act.

Sections 2(a) and 2(b) were proposed to the constitutional convention by the Revenue and Finance Committee as part of that Committee's Proposal No. 1, which proposed a separate finance article for the 1970 Constitution. The Committee's explanatory report stated that the proposed finance article was designed to contain

"the minimum restrictions necessary to insure sound management and the flexibility necessary to meet future economic developments." 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2008 (hereinafter cited as Proceedings). The provisions that became sections 2(a) and 2(b) were included as two separate sections of the proposal, sections 3 and 4, respectively. For ease of reference, we will refer to the proposed sections as 2(a) and 2(b).

Particularly significant is the Committee report's explanation of section 2(b). Section 2(b) replaced several sections of the 1870 Constitution dealing with appropriations. Among others, the section eliminated provisions that prohibited the legislature from enacting continuing appropriations (Ill. Const. 1870, art. IV, § 18), and that required that appropriation bills specify the purposes for which they are made and the amount appropriated for each purpose (Ill. Const. 1870, art. V, § 16). Section 2(b) also replaced section 17 of article IV of the 1870 Constitution. Section 17 had provided that "no money shall be drawn from the treasury except in pursuance of an appropriation made by law, and on the presentation of a warrant issued by the auditor thereon." The Revenue and Finance Committee proposed that this requirement be eliminated for the following reasons:

> "This provision seems, on the surface, to be a reasonable protection of the public purse, but it has caused a number of problems. For example, it has been read to require double appropriation of revolving fund monies, once to the revolving fund and again to the agency that uses the services provided by the fund. It results in the necessity to appropriate such routine items as tax refunds and payments to local governments resulting from shared taxes. It has also led to 'open-ended' or indefinite appropriation of federal grants that might become available. It has been cited as one reason for permitting universities and other state agencies to hold certain funds 'outside the treasury'.
>
> *This Committee is of the opinion that modern fiscal*

*control is adequate to protect the public purse without this unnecessarily restrictive provision.*" (Emphasis added.) 7 Proceedings 2024.

The Committee's proposal eliminated the above provisions and replaced them with what would become section 2(b). The Committee explained that, in drafting the new section, it had considered "a number of proposals for detailed wording," but had concluded that it was "impractical and undesirable to attempt to define the entire fiscal system in a constitution." 7 Proceedings 2031. The Committee explained its intent in drafting the new section as follows:

"The Committee's proposal to substitute two short sentences for much longer provisions in Article IV, Sections 16-19, and in Article V, Section 16 [of the 1870 Constitution], is based upon a desire to permit and encourage good fiscal practice. *Many possible systems might be used.* Some of these might involve, for example, 'no year' appropriations; others might continue the present Illinois practice of lapsing appropriations. *Some might permit funds to be paid from the state treasury only if appropriated, and some might also permit payment upon the basis of other kinds of authorization.*" (Emphasis added.) 7 Proceedings 2030.

This report leaves little doubt as to the intent of the Revenue and Finance Committee in drafting what became section 2(b). Plainly, the Committee intended to expand the legislature's discretion in the area of fiscal control. In particular, the Committee intended to allow the legislature the discretion to authorize spending other than through the annual appropriations process. This court had already held, under the more restrictive provisions of the 1870 Constitution, that the legislature could authorize the Authority to spend its own revenues in the manner set forth in sections 24 and 25 of the Toll Highway Act. In fact, this court held that this statutory authorization was, in effect, an appropriation of the toll revenues to the purposes specified in the toll highway legislation. The Revenue and Finance Committee's

report makes clear that the proposed appropriation provision for the 1970 Constitution was not intended to prohibit the legislature from authorizing spending other than through the annual appropriations process. Thus, there is no indication that the new appropriation provision was intended to alter this court's holding that the spending provision of the toll highway legislation was a valid authorization of spending by the legislature. Consistently, this court has recognized that "neither under the Constitution of 1870 nor under [section 2(b) of] the Constitution of 1970 have all State funds been expended pursuant to appropriations." *People ex rel. Kirk v. Lindberg,* 59 Ill. 2d 38, 40 (1974).

Further support for this interpretation is found in the comments made during the discussion of section 2(b) at the constitutional convention. Sections 2(a) and 2(b) were presented separately to the convention. Section 2(b) was presented to the convention by Delegate S. Johnson. The following colloquy took place between Delegate Johnson and Delegate Coleman regarding the scope of this section:

"MR. COLEMAN: Now is it correct that there are millions of dollars of state funds that never get into the treasury of the state of Illinois?

MR. S. JOHNSON: I believe that is correct.

MR. COLEMAN: And is it the committee's interpretation that these funds be included in the governor's Budget?

MR. S. JOHNSON: To the extent that it is necessary to show—first, to show the financial condition of the state and, secondly, the amount available for appropriation by the General Assembly, yes, it would be.

MR. COLEMAN: But these funds are never appropriated, are they?

MR. S. JOHNSON: Some of them are not, no.

MR. COLEMAN: So that if you follow that through to the logical conclusion, the amount of appropriations by the General Assembly will never come up to the amount of available income that is projected in the Budget?

MR. JOHNSON: They could or they could not. *The amount of money that should be subjected to the appropriation process we have left to the General Assembly to decide. If there are revolving funds which they feel ought to be brought into the appropriation process, they are free to do so.*

MR. COLEMAN: *Unless the General Assembly changes the present policy, there will be millions of dollars in funds that are outside the treasury of the state of Illinois that would never come into the appropriation process and they would be spent during the year?*

MR. S. JOHNSON: *That may be, yes.*

MR. COLEMAN: \*\*\* *[I]s it the committee's suggestion that the General Assembly change its present policy in this area?*

MR. JOHNSON: *We are not suggesting that they do.* We are suggesting, both in this article and in the one to follow, that the General Assembly must assume a much stronger responsibility than they have in the past for the control of state funds; and this is the principal reason that we have been so insistent upon establishing a legislative post-audit and making the General Assembly responsible that all public funds for auditing—to make sure that all public funds are used for the purposes for which they are intended.

MR. COLEMAN: \*\*\* I am only trying to get to the point that we do have funds that do not come into the state treasury but which currently are being collected and expended.

MR. JOHNSON: Yes.

MR. COLEMAN: Yet your committee, as I understand it, is including these funds in the overall governor's Budget. You want to account for them in the Budget, and what I am trying to get at is, if you account for them in the Budget and you do not account for them in the appropriation, how does this affect the validity of the Budget?

MR. S. JOHNSON: Well, to the extent that they are included to show the complete picture—the financial picture of the agency involved—they would be included in the Budget, *although they may not necessarily be funds*

*available for appropriation."* (Emphasis added.) 2 Proceedings 884-85.

Delegate Coleman's questions were followed up by Delegate Tomei:

"MR. TOMEI: \*\*\* [A]s I understand it, *the total picture presented by the Budget would include, for instance, revenues received from some of the agencies like the Toll Road, for instance, but that you would not require that those revenues that are received by the agency must then be appropriated by the legislature. In other words, they could continue to be paid out from receipts directly to bondholders if the legislature so permits?*

MR. S. JOHNSON: *If the legislature wished to do that.* The second sentence of section 1, which requires the express authority to obligate and make payment,[3] would cover that *if they chose not to cover it with the appropriation process."* (Emphasis added.) 2 Proceedings 885.

These comments, like the Committee report, clearly indicate that section 2(b) was not intended to prohibit the legislature from authorizing spending of certain funds through methods other than the annual appropriations process, even when those funds are required to be included in the Governor's budget under section 2(a).

The plaintiffs contend, however, that other comments by the delegates reveal that the Authority was intended to be included within the purview of the annual appropriations process. The plaintiffs point to several comments by Delegate Netsch in which she states that entities such as the Toll Road Authority were to be included in the Governor's budget. As stated by Delegate Netsch:

"We did want to have an all-inclusive-enough list here that it would be absolutely clear that agencies such as the

---

[3]"The State, units of local government and school districts shall incur obligations for payment or make payments from public funds only as authorized by law or ordinance." Ill. Const. 1970, art. VIII, § 1(b).

Toll Road Authority and other corporations created by the state with state funds to carry out state functions would be picked up and included. Armory boards, toll road authorities, or whatever." 2 Proceedings 877. Delegate Netsch further explained that certain entities, including the Toll Road Authority, had not been included in the Governor's budget in the past, and that the new budget provision was therefore being written to explicitly include those entities. 2 Proceedings 878. The plaintiffs argue that Delegate Netsch's comments reveal an intent to require the Authority's inclusion in the annual appropriations process. The plaintiffs, however, take these comments out of context. As noted, sections 2(a) and 2(b) were presented to the convention as separate sections and were discussed separately. Delegate Netsch's comments related only to the budget requirement. In fact, Delegate Netsch emphasized that she was discussing *only* the Governor's budget, not the appropriation provision. 2 Proceedings 877, 880. Moreover, when questioned about the relationship between the budget provision and the appropriation provision, Delegate Netsch, after first stating that all funds in the budget would be expended by appropriation, immediately corrected herself and stated that some funds in the budget may be expended by other means. The following colloquy on this subject took place between Delegates Netsch and Coleman:

"MR. COLEMAN: Mrs. Netsch, I think you stated over and over about revenue being included in the Budget and expenditures in the Budget that will not directly come from the treasury. I think you mentioned *toll roads*, and I am thinking in terms of university and prison funds and what not. I understand there are several hundred million dollars that doesn't get into the state treasury at all. I think—what I will ask you, is it correct to say these funds will be included in the governor's Budget in the income— the estimated income—and also the expenditure thereof?

MRS. NETSCH: That is correct. ***

\*\*\*

MRS. NETSCH: \*\*\* [A]ll those which are public funds would go into the Budget.

MR. COLEMAN: Now if you include these funds that don't get into the treasury, I assume you are anticipating *expenditures that would not be appropriated?*

\* \* \*

MRS. NETSCH: *We would not anticipate that \*\*\* [w]e would expect that nothing that would be expended would be expended except pursuant to appropriation.*

MR. COLEMAN: Thank you.

MRS. NETSCH: *I'm sorry. Let me rethink that a minute.*

MR. COLEMAN: I don't know how you can do it. That's all I wanted to say here.

MRS. NETSCH: *No, I overstated that a little bit, and I think that was not even directly responsive to what you raised.*

*We would expect that everything that was to be expended would go through the state Budget in whatever particular form that expenditure might take place.*

MR. COLEMAN: *Go through the State Budget, but it doesn't necessarily have to be expended by an appropriation?*

MRS. NETSCH: Depending on what is done with some other sections of the constitution." (Emphasis added.) 2 Proceedings 882.

Thus, Delegate Netsch's comments do not support the plaintiffs' position that all funds required to be included in the budget are required to be expended pursuant to annual appropriation. Rather, Delegate Netsch expressly acknowledged that the legislature could authorize expenditures through methods other than the annual appropriations process.

The plaintiffs further contend that a change to the language of section 2(b) made by the Committee on Style, Drafting and Submission (hereinafter Style and Drafting) reveals that section 2(b) was intended to require annual appropriations for spending by entities

such as the Authority. As proposed by the Revenue and Finance Committee, the first sentence of section 2(b) stated, "The General Assembly shall make appropriations for the expenditure of public funds." 7 Proceedings 2004. On first reading, this provision, along with the remainder of the proposed article, was tentatively approved by the convention sitting as the Committee of the Whole[4] and, per convention rules, referred to the Style and Drafting Committee, a procedural standing committee. The Style and Drafting Committee revised section 2(b) to read, "The General Assembly shall make appropriations for *all* expenditures of public funds *by the State*." (Emphasis added.) 7 Proceedings 2217. The Style and Drafting Committee's accompanying explanatory report stated that this change was made to express "the intent of the Committee of the Whole that all expenditures of public funds by the State be pursuant to appropriations." 7 Proceedings 2225. The plaintiffs contend that this revision reveals an intent to broaden the scope of section 2(b) beyond that intended by the Revenue and Finance Committee as set forth in its explanatory report. The plaintiffs' position is not persuasive. As seen from the above excerpts from the debates, it was clearly explained that, under the proposed provision, the legislature would continue to have the power to authorize some spending by means other than annual appropriations. We are not directed to any comments in the debates on section 2(b) which suggest that the Committee of the Whole disagreed with the Revenue and Finance Committee's proposed scope of section 2(b). Given the clearly expressed intent of the Revenue and Finance Committee and the fact that this method of

---

[4]Under the rules of the 1970 constitutional convention, the convention sitting as the "Committee of the Whole" would consider the proposals of the substantive committees such as the Revenue and Finance Committee.

spending had been utilized by the legislature and approved by this court for many years prior to the 1970 convention, we think that an intent to prohibit such spending would have been clearly expressed by the delegates.

In addition, the plaintiffs contend that a proposed change to section 2(a) by the Style and Drafting Committee supports their position that all funds required to be included in the budget under section 2(a) would also be subject to the annual appropriations process. The Style and Drafting Committee proposed that section 2(a) be modified to eliminate the clause which referred to "every office, department, authority, public corporation and quasi-public corporation of the State, State educational institutions, and other agencies of the State," and replace it with simply "the State." The Style and Drafting Committee explained the reason for this proposed modification as follows:

> "The deletion of this language is intended to avoid the impact of *expressio unius exclusio alterius* maxim. The inclusion of the laundry list of terms to describe offices, departments, authorities, etc., of the State would imply that in other instances in the Constitution when the word 'State' was used these offices, departments, etc., were not to be included." 7 Proceedings 2224-25.

On the motion of Delegate Netsch, however, this proposed modification was rejected and the "laundry list" was returned to section 2(a). Delegate Netsch explained the reason for retaining the list as follows:

> "[I]t is conceivable that the word 'state,' as a substitute for the long list that we had, might in some contexts be sufficiently broad; but we are most concerned by the fact that in the revenue article, which was also proposed by the same committee, the socalled [*sic*] laundry list has been retained in the section on state debt ***. We are deeply concerned—in view of the long history of this state, in which the governor's Budget has not always extended to all of the agencies and institutions of government that we

intend for it to cover—we are deeply concerned that the presence in one place in the constitution of the laundry list, the elimination of it here might lead to a misconstruction of this section." 5 Proceedings 4213.

We do not agree with the plaintiffs that this proposed change, which was ultimately rejected by the convention, supports an interpretation of section 2(b) that is contrary to both the report of the Revenue and Finance Committee and the comments of the delegates during the debates.

We note, moreover, that the spending scheme of the toll highway legislation has been in existence in substantially its present form since 1953. This court has recognized that the historical practice of the legislature may aid in the interpretation of a constitutional provision. In *Williams v. Kerner*, 30 Ill. 2d 11, 15 (1963), the plaintiff sued to void the Governor's veto of a redistricting bill passed by the legislature, arguing that redistricting was a function which the Illinois Constitution reserved exclusively for the legislature. In affirming the dismissal of the plaintiff's action, this court noted that previous redistricting bills, under substantially the same constitutional language, had been submitted to the Governor for his approval. This court found this historical practice to be a useful interpretive aid, reasoning that:

" 'General acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubts as to its meaning. This is especially true in the case of constitutional provisions governing the exercise of political rights and hence subject to constant and careful scrutiny.' " *Williams*, 30 Ill. 2d at 15, quoting *Smiley v. Holm*, 285 U.S. 355, 369, 76 L. Ed. 795, 801-02, 52 S. Ct. 397, 400 (1931).

See also *People ex rel. Douglas v. Barrett*, 370 Ill. 464, 469 (1939) ("in determining the validity of legislative action, the uniform, continued and contemporaneous

construction of the constitution given by the legislature over a long period of years and generally recognized by the public, is usually given great weight by the courts").

As noted, the challenged spending scheme of the toll highway legislation has been in force since 1953. It was held constitutional by this court under the 1870 Constitution. The plaintiffs contend that a provision in the 1970 Constitution was intended to invalidate this method of spending. However, at no time during the 27 years since the 1970 Constitution was ratified has the General Assembly subjected the Authority's revenues to the annual appropriations process. To the contrary, the Authority has apparently continued to collect and expend its revenues without an annual appropriation pursuant to the authorization contained in sections 24 and 25. Further, during this time, the legislature has amended the Toll Highway Act numerous times, without changing the spending provision to require annual appropriations.

As a final matter, we address an argument raised by *amici curiae* filing in support of the plaintiffs. The *amici* take the position that the legislature has the power to authorize certain public entities to spend their own revenues for statutorily specified purposes without annual appropriations. They contend, however, that the constitution does not permit the Authority to be such an entity. The primary basis offered for this contention is that the toll revenues are paid to the state treasurer. See 605 ILCS 10/24 (West 1996). The *amici* argue that this fact makes the Authority's revenues "State funds" which may be expended only pursuant to annual appropriations. We disagree. The predecessor version of the Toll Highway Act also provided that the toll revenues be paid to the state treasurer. See Ill. Rev. Stat. 1953, ch. 121, par. 314a45. Despite this provision, this court held that the spending structure of the Act was constitu-

tional under article IV, section 17 of the 1870 Constitution, which provided that "no money shall be drawn from the treasury except in pursuance of an appropriation made by law." In reaching this holding, this court relied on the distinction between the general revenues of the state and the revenues received by the Toll Commission, not on whether the funds in question were physically located in the state treasury or elsewhere. *Toll Highway Comm'n*, 3 Ill. 2d at 229.

Like the predecessor statute, the current Toll Highway Act clearly contemplates that the toll revenues, although paid to the state treasurer, will not be integrated with the general, tax-derived revenues of the state. Rather, the statute provides that the toll revenues will be held by the treasurer as a special fund, to be used solely for the purposes specified in the Act. See 605 ILCS 10/24 (West 1996). That the moneys in the Toll Fund are separate from the general funds of the state is further demonstrated by section 18 of the Toll Highway Act, which provides that, if any money is "appropriated by the General Assembly for the payment of ordinary and contingent expenses of the Authority or *** compensation of the members of the Authority," that money "shall be *repaid to the State Treasury*." (Emphasis added.) 605 ILCS 10/18 (1996); see also 605 ILCS 10/35(c) (West 1996). Moreover, this court has explained the role played by the state treasurer under this type of statutory scheme. In *Baro v. Murphy*, 32 Ill. 2d 453, 458 (1965), this court upheld the constitutionality of a statutory provision which directed that the revenues derived from the operation of state parks were to be paid to the state treasurer and held in a special trust fund to be used for maintenance and operation costs and debt service. In rejecting a constitutional challenge to this provision, the *Baro* court noted that "[t]he monies channeled directly into the State Parks Revenue Bond Fund ***

are not general revenue. These specific monies *are deposited with the State Treasurer as treasurer for the Commission rather than as custodian of the general revenue of the State.*" (Emphasis added.) *Baro,* 32 Ill. 2d at 458. Finally, the interpretation urged here by the *amici* is contrary to the explicit comments in the Revenue and Finance Committee report which indicate that section 2(b) would permit funds to be paid "from the state treasury" based upon kinds of authorizations other than annual appropriations. 7 Proceedings 2030. Accordingly, we do not agree that the fact that the toll funds are paid to the state treasurer prohibits the expenditure of those funds pursuant to the authorization contained in the Toll Highway Act.

## CONCLUSION

Accordingly, we hold that section 2(b) of article VIII of the 1970 Constitution does not prohibit the legislature from authorizing the method of spending contained in the Toll Highway Act. This court upheld this spending scheme under the 1870 Constitution and the drafting history of section 2(b) clearly indicates that this section was not intended to alter that holding. The orders of the circuit court holding sections 24 and 25 of the Toll Highway Act unconstitutional and preliminarily enjoining any disbursements pursuant to these sections are therefore reversed.

In closing, we note that many of the concerns expressed by the plaintiffs in this case stem from the actions of prior members of the Authority. This court is well aware of the allegations of misfeasance which have been directed at the Authority. As stated, however, the issue presented in this case concerns the power of the General Assembly, *not* the Authority. The power of the Authority, it is conceded by the parties, is wholly determined by the General Assembly. The wisdom of continuing to allow the Authority to operate with the

fiscal independence it has enjoyed in the past is a question for the legislature, not this court, to decide.

*Reversed.*