2020 IL App (2d) 190225-U
No. 2-19-0225
Order filed September 17, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| OMEGA DEMOLITION CORPORATION, | ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiff-Appellee and Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 16-CH-1353 |
| | ) | |
| JUDLAU CONTRACTING, INC.; ILLINOIS STATE TOLL HIGHWAY AUTHORITY; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA; ZURICH AMERICAN INSURANCE COMPANY; and LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Judlau Contracting, Inc., Defendant-Appellant and Cross-Appellee). | ) ) ) | Honorable Bonnie M. Wheaton, Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: In dispute between contractor and subcontractor on Tollway project, the trial court properly excluded as irrelevant the contractor's estimate of what the subcontractor left incomplete on its project: the parties agreed in the subcontract that the Tollway's word was definitive on what percentage of the project the subcontractor

had completed. The court also did not err in denying statutory interest to the subcontractor or in its calculation of damages for scrap metal that was wrongfully withheld from the subcontractor.

¶ 2 Plaintiff, Omega Demolition Corporation, was a subcontractor for the demolition of a bridge (Thorndale Avenue bridge) on property owned by the Illinois State Toll Highway Authority (Tollway) as part of a larger construction project in the western suburbs (the Elgin-O'Hare project). Defendant, Judlau Contracting, Inc., was the general contractor. Plaintiff filed this action against defendant and three insurance companies (the sureties). After a bench trial, the court found for plaintiff, awarding it damages from defendant for breach of contract and relief against the Tollway and the sureties. Defendant appeals, contending that the court abused its discretion in barring testimony from its project manager on the cost of completing plaintiff's work after the Tollway barred plaintiff from the site. Plaintiff cross-appeals, contending that the court erred in denying it interest on the award and limiting its recovery for scrap left on the site. We affirm.

¶ 3                                I. BACKGROUND

¶ 4 On June 28, 2018, plaintiff filed a five-count amended complaint. Count I, for an accounting, alleged as follows. In 2015, the Tollway and defendant entered into a contract for the Elgin-O'Hare project. In December 2015, plaintiff and defendant entered into a subcontract under which plaintiff would provide labor and materials to remove the Thorndale Avenue bridge. The price was $480,000. Plaintiff timely completed its work. After deducting all credits and allowances, defendant still owed plaintiff $438,280. Plaintiff duly notified the Tollway and the sureties of the outstanding balance. On or about May 23, 2017, defendant tendered $58,495.87 to some of plaintiff's sub-subcontractors (third-tier contractors), but it had not paid plaintiff anything. Plaintiff requested an accounting of the amount due it; a mechanic's lien on the money due it; payment from the Tollway of $379,784.13 plus interest and costs; and attorney fees.

¶ 5    Count II was directed against defendant for breach of contract. It repeated the allegations of count I and added the following. The subcontract entitled plaintiff to the reasonable value of scrap materials generated by its work. That value was $36,460, none of which defendant had paid plaintiff. Defendant's repeated refusal to pay plaintiff for its labor and materials was an unreasonable delay, as was defendant's refusal to pay for the scrap. These delays entitled plaintiff to interest under section 205/2 of the Interest Act (815 ILCS 205/2 (West 2018)). Further, under the subcontract, plaintiff should receive prejudgment interest of 5% per annum on all payments that had been unreasonably withheld. Defendant's breaches had caused plaintiff damages in excess of $416,244.13. Count II prayed for these damages, plus interest, costs, and attorney fees.

¶ 6    Count III was a claim on a contractor's bond against the sureties and is not pertinent to this appeal. Count IV was a claim against defendant for interest under the State Prompt Payment Act (30 ILCS 540/0.01 *et seq*. (West 2018)). Count V, pleaded in the alternative to count II, sought recovery in *quantum meruit* against defendant.

¶ 7    On November 28, 2017, defendant filed an answer and an amended counterclaim. The answer alleged in part as to count I of the amended complaint that plaintiff had completed only a portion of its obligations when the Tollway revoked plaintiff's permission to work on the project and plaintiff ceased work. Defendant admitted that, on or about May 23, 2017, it tendered plaintiff checks totaling $58,495.87 for plaintiff to distribute to its third-tier contractors for their work; defendant had not paid any other money to plaintiff. As to count II, defendant admitted that the subcontract required plaintiff to remove and dispose of for its own account the scrap materials generated by its work on the project. Defendant denied that the scrap was worth what plaintiff claimed. Defendant denied liability on any count directed against it.

¶ 8    In its amended counterclaim, defendant sought a setoff and alleged as follows. In 2015, plaintiff and defendant had entered into subcontracts for both the Elgin-O'Hare project and a Cook County project centered on the Jane Addams Tollway (Jane Addams project). Plaintiff breached the Jane Addams project subcontract in various ways. A worker for plaintiff was killed on site on April 5, 2016, and a wrongful-death action was pending in Cook County. Plaintiff's breaches had exposed defendant to potential liability of more than $50,000, plus the costs of defending claims against it. The counterclaim requested a setoff against damages defendant incurred in the Cook County case from plaintiff's breaches of the Jane Addams project subcontract.

¶ 9    On December 19, 2017, plaintiff answered the counterclaim. It denied breaching the Jane Addams project subcontract and alleged that the Cook County suit had no bearing on this case.

¶ 10    Before trial, defendant clarified that it included the counterclaim to make the court aware of its exposure to liability in the Cook County case, and "the issues involving that case [were] among the reasons as to why there[] [had] not been more payment *** on this case." Defendant would not be seeking "to adjudicate the amounts" of any setoff. The cause proceeded to trial.

¶ 11    Plaintiff first called Michael McMahon, who testified on direct examination as follows. He was plaintiff's vice president of estimating, which involved quantifying volumes of material and setting a price for its removal. For the Thorndale Avenue project, McMahon typed up a proposal to defendant. Eventually, plaintiff received the subcontract to remove the bridge's superstructure and substructure. The price was $480,000.

¶ 12    The subcontract (admitted by stipulation) included an attachment stating, " 'Subcontractors shall take title to all salvage arrived [*sic*] from removal work and will coordinate all removal from the jobsite at no cost to [defendant].' " "Salvage" was " 'any type of steel, whether it be rebar or

the beams from the project.' "[1] Another attachment contained exclusions from the subcontract, including lane closures, barricades, detours, and placing protective shielding when beams were removed.

¶ 13    McMahon testified that plaintiff worked on the project during February, March, and April 2016 and removed nearly the entire bridge. Late in April, within a week after plaintiff had been removed from the project, McMahon went to the jobsite to document what was left of the bridge and any salvage remaining on the site. The salvage consisted of structural steel, primarily beams, and rebar, which was steel placed inside the concrete deck of the bridge in order to strengthen it. Accompanying him were James Gerage, plaintiff's part owner, and two representatives of defendant. The examination lasted about two hours. McMahon took numerous photographs. All but about 92 cubic yards of a crash wall and some concrete on either side of the bridge had been removed. Steel beams and rebar on both sides still needed to be removed.

¶ 14    McMahon identified plaintiff's exhibit No. 10 as a letter that he wrote on April 25, 2016, documenting his findings. McMahon mailed the letter to defendant, but he never received a response. According to the letter, $41,720 remained of plaintiff's work. The letter stated that 120 tons of plate and structural steel and 100 tons of rebar were left on the site. Based on the going rate paid by General Iron, a recycler that would take the salvage, the salvage left on site was worth $21,360 for the structural steel and $15,100 for the rebar, or a total of $36,460.

¶ 15    McMahon testified about how he calculated the amount of salvage left on the site. On the site, he and Gerage "physically measured and quantified the beams. We had existing drawings of

---

[1] We quote McMahon's testimony and not the subcontract, as neither it nor any other exhibits are in the record on appeal.

the bridge. They matched up with what was there on the as-billed drawings." What McMahon found on the site was consistent with what the project drawings revealed. McMahon also measured the rebar stacked on the site.

¶ 16    McMahon testified on cross-examination as follows. He calculated the weight of the rebar on site by using a tape to measure the length, width, and height of the piles and multiplying the total cubic feet by 490 pounds (the weight of steel per cubic foot). The photographs admittedly depicted a "tangle of rebar" with considerable air pockets. Asked how he calculated the volume of a "jumbled tangle of rebar," McMahon explained, "[t]he deck and everything was still intact. *** I know how many pounds a foot is typically in a deck."

¶ 17    Charles Gerage testified on direct examination as follows. He owned part of plaintiff and had been involved in hundreds of bridge demolitions. The subcontract allowed plaintiff to take title to all salvage derived from removal work. During the project, plaintiff never received any notification from defendant that it was violating any subcontract terms. Plaintiff had numerous third-tier contractors working under it, and they received payment via joint checks from defendant and plaintiff. The third-tier contractors were entitled to a total of approximately $124,000 under the subcontract. Plaintiff paid its employees on the site weekly. Plaintiff began preparations for the project late in 2015, including a demolition plan, and began the actual work in January 2016, but defendant paid it nothing in advance. Plaintiff stopped work involuntarily in April 2016.

¶ 18    Gerage identified plaintiff's exhibit No. 2 as its invoice to defendant, dated February 29, 2016, for $140,600 due March 30, 2016 for work performed to date. The bill was never paid. Plaintiff's exhibit No. 3 was an invoice dated March 31, 2016, for $214,400. The only part of this bill that defendant paid was by joint check to third-tier contractors. The February 29, 2016, invoice attached a document from the Tollway stating that it had paid defendant $337,500, 27% of the

overall contract price of $1.25 million. Another attachment was an outline of tasks that plaintiff stated had been completed and the compensation due. These included 100% of mobilization, 100% of engineering, and one third of removing the substructure of the bridge. A final attachment was a letter from plaintiff billing defendant. The March 31, 2016, invoice attached similar documents stating in part that plaintiff considered its work 74% completed and was billing defendant accordingly. An attachment from the Tollway stated that it had paid defendant $550,000 for having completed 44% of the bridge demolition project. Other than payments passed on to third-tier contractors, plaintiff had never received any of what it had billed defendant.

¶ 19    Gerage identified plaintiff's exhibit No. 4 as a third invoice, dated April 30, 2016. It stated that the only work that plaintiff had not finished was removing the substructure. Of the $125,000 allotted to this task, plaintiff billed $83,280 for what it had done. In all, plaintiff billed the entire subcontract price except $41,720. Plaintiff billed 91% of the subcontract price, because plaintiff had completed 91% of its work. A Tollway document attached to the invoice stated that the Tollway had paid defendant another $175,000 since the prior pay period. Again, defendant had paid the third-tier contractors but had not paid anything directly to plaintiff.

¶ 20    Gerage testified that plaintiff's last day on the project was April 14, 2016, or a day or two after. Plaintiff stopped its work because the Tollway revoked its approval and requested the Illinois Department of Transportation's chief procurement officer, Elaine Daley, to suspend plaintiff from work on any State projects. An "interim suspension" issued April 15 or 16, 2016. Plaintiff contested the interim suspension. Approximately 7 to 10 days later, a hearing was held and, a few days later, Daley lifted the suspension, found that it had been without reason, and issued plaintiff a letter to that effect. Gerage then contacted Arnoff Ahmen, defendant's vice president, but Ahmen told him that plaintiff would not be allowed back on the project.

¶ 21    Gerage identified plaintiff's exhibit No. 23 as an e-mail that he sent Ahmen on April 17, 2016, stating that the Tollway's unlawful termination of the subcontract would delay plaintiff's completion of its work.  He could not recall receiving a reply.  Gerage identified plaintiff's exhibit No. 25 as his letter of April 18, 2016, to Ahmen, stating that defendant was withholding payments due plaintiff on both projects but had no right to do so.  He received no response.  Plaintiff's exhibit No. 27 was an e-mail from Gerage to Ahmen stating that General Iron, the recycler, could remove scrap and forward the revenue to plaintiff.  Defendant did not agree to the proposal.  Plaintiff had received none of the $36,460 that McMahon said should have been generated from scrap.

¶ 22    Gerage identified other exhibits as evidence of the lien that plaintiff filed on May 26, 2016, in connection with the Thorndale Avenue bridge project and proofs of service on the sureties.  Gerage testified that defendant had been wholly responsible for providing protective shielding on the project and had never told plaintiff to do anything about shielding.

¶ 23    Gerage testified that Tollway documents established that defendant had been paid the full $1.25 million owed for the bridge demolition that plaintiff had performed.  The fatality on the Jane Addams project was unrelated to the Thorndale Avenue project.

¶ 24    On cross-examination, Gerage identified a copy of a letter from the Tollway to Ahmen, dated April 14, 2016, informing defendant that plaintiff's subcontractor approval for Tollway projects was revoked effective April 15, 2016.  Gerage testified that the Tollway sent a letter to chief procurement officer Ellen Daley requesting that plaintiff be "suspend[ed]."  He reiterated that plaintiff had been subjected to an "interim suspension"; that Daley held a hearing; and that, a few days later, in early in May 2016, the office issued a letter removing the interim suspension.  Gerage sent copies of the May 2016, letter to Ahmen and the Tollway.  Asked whether the Tollway

had ever withdrawn the revocation (or suspension) of its approval of plaintiff, Gerage testified that he believed that it had issued a letter to that effect, but he could not recall when.

¶ 25    Gerage testified that, after plaintiff left the project, concrete from the removal of the superstructure remained on site. Plaintiff had planned to process it and crush it.

¶ 26    On redirect, Gerage testified that he had suggested renting plaintiff's equipment to defendant to remove scrap from the site. After the hearing that cleared plaintiff, Gerage notified defendant that the revocation (or suspension) had been lifted and mailed it a copy of the May 2016, letter. Defendant refused to allow plaintiff back on the job and refused to use plaintiff's equipment or work with General Iron. On re-cross-examination, Gerage testified that, right after the Tollway issued its notification of April 14, 2016, Daley sent him a letter issuing an "interim suspension."

¶ 27    The parties stipulated that defendant paid $124,125.22 to plaintiff's third-tier contractors. The court admitted plaintiff's exhibit No. 28, a letter dated May 3, 2016, from Daley to Gerage, stating that the "interim suspension" was terminated as of that date. Plaintiff rested.

¶ 28    Defendant called Daniel Martinez, its manager on the Elgin-O'Hare project and others. He identified defendant's exhibit No. 1 as the Tollway's revocation of its approval of plaintiff as a subcontractor. He received a copy of the notice on April 14, 2016, and forward a copy to plaintiff. Defendant's exhibit No. 2 was an approved pay estimate generated by the Tollway for April 1, 2016, through April 30, 2016. It stated in part that, overall, plaintiff had completed 85% of its work, which the Tollway had approved for payment. Martinez identified defendant's exhibit No. 3 as a photograph taken on April 20, 2016. It showed the bridge demolition to date, including two piles of steel and rebar. Defendant's exhibit No. 4 was a closeup of part of the previous exhibit.

¶ 29    Martinez testified that, by April 14, 2016, plaintiff had not completed the demolition. The bridge's crash wall footers had yet to be removed. Defendant did this work. Martinez identified

defendant's exhibit No. 5 as showing the cost of this work. Plaintiff objected that defendant was improperly attempting to raise a setoff claim that it had not pleaded in its counterclaim. See 735 ILCS 5/2-608 (West 2018). Defendant responded that it was not seeking a setoff but that the evidence was relevant to contradict plaintiff's claim that it had completed 91% of its work.

¶ 30 The court sustained plaintiff's objection. The court explained, "The only issue that is framed by the pleadings *** is how much of the contract was completed. The cost to complete is really not material to any issue. It's *** what was left and how much of the contract that was."

¶ 31 Defendant moved for leave to amend its pleadings. The court denied the motion, explaining that evidence of the cost of completion would not be relevant to any issue in the case.

¶ 32 Defendant questioned Martinez about repairs that defendant had made to protective shielding damaged by plaintiff's work. Plaintiff objected that this question went to a setoff, which had not been pleaded. The court sustained the objection. Defendant made an offer of proof, detailing evidence of the labor, equipment, and trucking needed to complete the work, repair the shielding, and pay for the lane closures that had been necessitated by plaintiff's actions.

¶ 33 Martinez identified defendant's group exhibit No. 13 as including a check from All American Recycling (All American) for scrap from both the Elgin-O'Hare and Jane Addams projects, including $6348.40 for scrap from the Elgin-O'Hare project. Another check from All American, included in defendant's group exhibit No. 15, was for $1164.16 for scrap from the Elgin-O'Hare project. A third check from All American, included in defendant's exhibit No. 14, was for $2032 for scrap purchased from the Elgin-OHare project. The check in defendant's group exhibit No. 14 was for rebar, and the others were for structural steel. Martinez identified several photographs taken April 20, 2016, of the scrap left on the Thorndale Avenue bridge site.

¶ 34 Martinez testified on cross-examination that he received McMahon's letter on April 25, 2016, but did not respond. Defendant sold approximately 25 tons of rebar and approximately 38 tons of steel to All American. McMahon's letter stated that 100 tons of rebar and 120 tons of steel had been on the site when he and Martinez had examined the site. The site was about a mile square and had not been fenced in. The rebar and steel had not been fenced in or secured.

¶ 35 Walter Stoklosa testified that he was defendant's manager on the Jane Addams project. When defendant questioned him about the events of April 5, 2016, when plaintiff's employee was killed on that project, plaintiff objected that the testimony was irrelevant. Defendant responded that the Jane Addams project litigation was relevant to "any issues of why payment was not made in this case for amounts earned." The court stated that the two cases were separate and sustained plaintiff's objection. Defendant rested.

¶ 36 In its closing argument, plaintiff claimed damages of $380,334.78 plus interest, representing (1) three pay applications totaling $438,280; (2) lost profits on the part of the job that it could not complete, $29,720; and (3) scrap worth $36,460, minus (4) $124,125.22 paid to the third-tier contractors. The interest claimed, calculated from the end of May 2016, when payment was due, was either $250,083.24, based on the State Prompt Payment Act (30 ILCS 540/0.01 *et seq*. (West 2018)) or $156,768, based on the Contractor Prompt Payment Act (815 ILCS 603/1 *et seq*. (West 2018)). Plaintiff contended that it had proved all four counts of its amended complaint. The evidence showed that the subcontract price was $480,000, that plaintiff worked on the job until April 14, 2016, and that, early in May 2016, plaintiff presented defendant the letter from the chief procurement officer stating that the interim suspension was over and plaintiff could complete its work, but defendant refused to allow it to do so. Defendant had paid plaintiff nothing,

even though the Tollway had paid defendant the full $1.25 million due on the Thorndale Avenue bridge removal.

¶ 37    Plaintiff turned to what it considered the disputed issues.  The first was how much work plaintiff had done.  Plaintiff's exhibit Nos. 2, 3, and 4 showed that, in all, it had finished 91% of the work.  Defendant had provided no calculations to the contrary; Martinez had merely read from a Tollway statement that plaintiff had completed 85% of its work.

¶ 38    The second disputed issue was what plaintiff was due for scrap.  McMahon's letter to defendant stated that the joint examination made late in April 2016 showed that there were 120 tons of structural steel, with a value of $21,360, and 100 tons of rebar, with a value of $15,100, for a total of $36,460.  Defendant never responded to McMahon's letter, implying that it did not dispute his conclusions.  Defendant had refused to allow a third party to remove the scrap and sell it and failed to secure the scrap.  It sold far less scrap than what McMahon had found was present, and thus what it received was far less than what plaintiff was owed under the subcontract.

¶ 39    The third disputed issue was lost profits.  Plaintiff argued that, after May 3, 2016, it had a right to return to the project but defendant prevented it from doing so. Its lost profits were $29,720.

¶ 40    The fourth disputed issue was interest.  Plaintiff noted that defendant had not paid any of what it owed plaintiff and that the last payment was due May 30, 2016.  Thus, plaintiff was due either $250,830.24 (State Prompt Payment Act) or $156,768.90 (Contractor Prompt Payment Act). Counting both damages and interest (at the higher rate), defendant owed plaintiff $631,165.02.

¶ 41    Defendant argued first that the issue of how much of the subcontract plaintiff had completed was controlled by paragraph 39 of the subcontract, which stated, "[T]he quantities as determined by the [Tollway] are binding upon the subcontractor in terms of entitlement to

payment."[2] Therefore, "The [T]ollway's determination of 85 percent authorized for acceptance and payment trumps whatever [plaintiff] might think [it] did. It would trump however much less [defendant] might think [plaintiff] did." Defendant argued further that the May 3, 2016, letter from Daley, lifting a "suspension," did not clearly refer to the "revocation" of April 14, 2016. Plaintiff had materially breached the subcontract, which defeated its right to a lien.

¶ 42 Defendant turned next to the scrap issue, arguing first that the subcontract obligated plaintiff to remove all demolition material from the site at no cost to defendant, which plaintiff clearly failed to do, because of its own improprieties. Further, McMahon's testimony was "somewhat laughable with respect to taking a tape measure to a pile of rebar and measuring its height and width." The only evidence of the scrap's value was what defendant received for what it sold. Plaintiff merely speculated that more scrap had been on the site.

¶ 43 Defendant argued third that plaintiff had not established lost profits with the needed precision. Defendant argued fourth that both the Contractor Prompt Payment Act (815 ILCS 603/10(2) (West 2018)) and the State Prompt Payment Act (30 ILCS 340/7(b) (West 2018)) require a contractor to pay subcontractors within 15 days after the contractor receives payment from the owner. There had been insufficient evidence of that predicate. Further, the State Prompt Payment Act is limited to agencies that are authorized to provide for payment from state funds by virtue of a legislative appropriation for goods and services furnished to the State. 30 ILCS 540/1 (West 2018). The Tollway paid vendors from tolls and other charges, not legislative

---

[2] We quote defendant's argument, not the subcontract, as neither the subcontract nor any other exhibits are in the record on appeal.

appropriations. Also, defendant had had reasonable cause to withhold payments, as the Cook County project litigation exposed it to potential liabilities far exceeding what it faced here.

¶ 44     In rebuttal, plaintiff argued that there was no reasonable cause for defendant's failure to pay anything years after the project ended. Next, plaintiff argued, defendant could not limit its liability for scrap by relying on plaintiff's failure to remove it, as plaintiff had offered to have a third party do so but defendant had refused. Further, defendant had not explained what happened to most of the 220 tons that the parties found on the site on April 25, 2016. Finally, the letter from Daley stated that the "interim suspension" had been terminated, and no evidence contradicted it.

¶ 45     The trial court ruled as follows. First, the subcontract stated that "the determination of the [Tollway]" was "binding as to the percentage of the contract completed." As the Tollway had determined that plaintiff completed 85% of the contract, plaintiff could not well contend that it had completed 91%. Second, on the revocation/suspension issue, the court concluded that there was no way to determine whether the Tollway's April 14, 2016, letter and Daley's May 3, 2016, letter were referring to the same thing. There was also no way to determine whether Daley had had the authority to override the Tollway's decision. Thus, defendant had properly barred plaintiff from the site and properly refused to allow plaintiff to resume work after May 3, 2016.

¶ 46     The court turned to plaintiff's claim for the value of the scrap it had generated. As the subcontract gave plaintiff title to the scrap, plaintiff also had the right to take possession of it and sell it. The value was at issue. McMahon had estimated its value, but "an estimate is just that, an estimate." The best evidence was what defendant actually received from All American. Next, the court held that plaintiff could not recover lost profits, as it had failed to prove that its exclusion from the site after May 3, 2016, was wrongful.

¶ 47    The court stated that the death of plaintiff's worker on the Jane Addams project had exposed defendant to potential liability and was currently the subject of litigation. It was "not unreasonable" for defendant to withhold payment under the circumstances. In any event, neither statute covered the case. However, under the subcontract, plaintiff was entitled to 5% interest.

¶ 48    The court gave the following numbers. Of the $480,000 contract price, $408,000 was due (85%). Of this amount, the parties had stipulated that $124,125.22 was due the third-tier contractors, leaving a balance of $283,874.78. Added to this was the proved value of scrap, $9634.56. Thus, the total amount due plaintiff was $293,509.34. Contractual interest was an additional $42,176.89, for a total judgment of $335,686.23. Also, the court granted plaintiff a lien against public funds. The court entered a written judgment consistent with the foregoing. Defendant timely appealed, and plaintiff timely cross-appealed.

¶ 49                                    II. ANALYSIS

¶ 50    On its appeal, defendant makes three arguments, but the second and third depend on the first: the trial court erred in barring Martinez from testifying about the cost of completing plaintiff's work after April 14, 2016. Defendant argues second that, even if defendant's cost of completion is a "setoff," it did not have to be pleaded via a counterclaim. Defendant argues third that, even were a counterclaim required for defendant to introduce its cost of completion, the court abused its discretion in refusing to allow defendant to amend its pleadings.

¶ 51    On its cross-appeal, plaintiff argues that the court erred in denying it interest under one of the two statutes and that the court did not fully compensate it for the value of its scrap.

¶ 52    Before proceeding further, we note that the record on appeal does not contain any of the exhibits that were admitted at trial. It is the duty of the party claiming error to provide a sufficient

record on appeal, and any incompleteness in the record must be construed in favor of the judgment. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 53    We turn first to defendant's appeal.  Defendant argues primarily that the trial court abused its discretion in sustaining plaintiff's objections to defendant's attempt to introduce, through Martinez, evidence of defendant's cost of completing plaintiff's obligations after plaintiff was barred from the jobsite.  In the trial court, plaintiff contended that the evidence was relevant only to whether defendant could recover a setoff against a judgment for plaintiff, but that defendant had never pleaded a claim or a setoff on this basis. Defendant argued that the evidence was relevant because plaintiff claimed that it had completed 91% of its work under the subcontract and defendant denied that claim.  Defendant  now contends that the trial court abused its discretion in refusing to admit the evidence, because it would have tended to prove that plaintiff had completed only about 80% of its obligation under the subcontract, thus lessening its damages.

¶ 54    " 'Relevant evidence' " is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Ill. R. Evid. 401 (eff. Jan. 1, 2011). The trial court has discretion to decide whether evidence is relevant.  *People v. Montano*, 2017 IL App (2d) 140326, ¶ 74.

¶ 55    We hold that the trial court did not abuse its discretion in refusing to admit evidence of defendant's cost of completing plaintiff's work.  Defendant contends that the evidence was relevant to prove that plaintiff had completed only about 80% of its work, not 91% as it claimed. But the point is that this discrepancy did not matter.  As the trial court held, under the plain language of the subcontract, the Tollway alone determined what percentage of plaintiff's obligation had been completed.  As defendant stated in its closing argument, "The [T]ollway's determination of 85 percent authorized for acceptance and payment trumps whatever [plaintiff]

might think [it] did. *It would trump however much less* [*defendant*] *might think* [*it*] *did.*" (Emphasis added.) Defendant was correct the first time. As the evidence of defendant's cost of completing plaintiff's work was irrelevant to the sole issue as to which defendant now contends that it was relevant, we hold that there was no error.

¶ 56    Defendant contends second that, even if its cost of completion should have been considered a setoff, defendant did not have to file a counterclaim to raise it. Defendant argues that the cost of completion was not in the nature of a counterclaim but merely sought a reduction in damages. Even granting this, however, the contention is a red herring. Whether a counterclaim was necessary for defendant to introduce the evidence of the cost of its completion was irrelevant to the trial court's exclusion of the evidence. The court excluded the evidence not because of an alleged pleading defect but because the evidence was irrelevant, for the reasons we noted in addressing defendant's first contention of error. Defendant's third contention, that the court should have allowed it to amend its pleadings in order to raise the alleged setoff, is similarly misguided. The court did not rule on procedural grounds that a counterclaim was needed to raise a setoff; it ruled that defendant's cost of completion was irrelevant.

¶ 57    Defendant's appeal is meritless. We turn to plaintiff's cross-appeal.

¶ 58    Plaintiff contends first that the trial court erred in refusing to grant it interest under either the Contractor Prompt Payment Act or the State Prompt Payment Act. Plaintiff argues that it met all the prerequisites under either Act. For the following reasons, we hold that neither statute applies here. Therefore, we affirm the denial of interest under either Act. We note that, although the trial court did not rely on the construction of either statute, we may affirm its judgment on any basis called for by the record. See *Bell v. Louisville & Nashville R.R. Co.*, 106 Ill. 2d 135, 148 (1985).

¶ 59    In construing a statute, our goal is to ascertain and effectuate the intent of the legislature. *In re Application for Judgment and Sale of Delinquent Properties for the Tax Year 1989*, 167 Ill. 2d 161, 168 (1995). Ordinarily, the language that the legislature chose is the best guide to its intent, and, if it is unambiguous, we must apply it straightforwardly. *Id.* If a statute does not define a term, we may look to the definitions used in other statutes addressing the same subject matter, even if they are not strictly *in pari materia*. *Id.* at 168-69; *Christian County Board of Review v. Property Tax Appeal Board*, 368 Ill. App. 3d 792, 800 (2006).

¶ 60    We start with the Contractor Prompt Payment Act.[3] It applies to "Construction contracts" (815 ILCS 603/10 (West 2010). It defines "construction contract" as "a contract or subcontract, entered into after the effective date of this Act, for the design, construction, alteration, improvement, or repair of Illinois real property, *except for contracts that require the expenditure of public funds*." (Emphasis added.) *Id.* § 5(b).

¶ 61    The Contractor Prompt Payment Act does not define "public funds." However, section 1 of the Public Funds Investment Act (30 ILCS 235/1 (West 2018)) states:

"The words 'public funds', as used in this Act, mean current operating funds, special funds, interest and sinking funds, and funds of any kind or character belonging to or in the custody of any public agency.

The words 'public agency', as used in this Act, mean the State of Illinois, the various counties, townships, cities, towns, villages, school districts, educational service regions,

---

[3] We note that count IV of plaintiff's complaint relied solely on the State Prompt Payment Act and did not plead the Contractor Prompt Payment Act. However, defendant did not raise this problem at the trial level and does not do so here.

special road districts, public water supply districts, fire protection districts, drainage districts, levee districts, sewer districts, housing authorities, the Illinois Bank Examiners' Education Foundation, the Chicago Park District, and *all other political corporations or subdivisions of the State of Illinois, now or hereafter created, whether herein specifically mentioned or not*.  This Act does not apply to the Illinois Prepaid Tuition Trust Fund, private funds collected by the Illinois Conservation Foundation, or pension funds or retirement systems established under the Illinois Pension Code, except as otherwise provided in that Code."  (Emphasis added.)

¶ 62    The subcontract required defendant to pay plaintiff for work performed on Tollway property, specifically the Thorndale Avenue bridge, the Tollway having paid defendant $1.25 million of its funds and defendant remitting $480,000 of that sum to plaintiff.  These payments were of "public funds," as the Tollway is a "public agency" (*id.*)  The catch-all provision emphasized above takes in the Tollway.  Moreover, had the legislature wished to exclude the Tollway from the statute, it could have added it to the list of entities following the catch-all provision.  Aside from the plain meaning of section 1, therefore, we may also rely on the rule of construction, "*inclusion unius est exclusion alterius*."  See, *e.g.*, *City of St. Charles v. Illinois Labor Relations Board*, 395 Ill. App. 3d 507, 509-10 (2009).

¶ 63    Because the contract and subcontract "require[d] the expenditure of public funds" (815 ILCS 603/5(b) (West 2018)), they were exempt from the Contractor Prompt Payment Act. Therefore, interest cannot be awarded on that ground.

¶ 64    We turn to plaintiff's alternative ground for interest: the State Prompt Payment Act.  This statute applies to "any State official or agency authorized to provide for payment from State funds, *by virtue of any appropriation of the General Assembly*, for goods or services furnished to the

State." (Emphasis added.) 30 ILCS 540/1 (West 2018). As defendant argued in the trial court, the Tollway does not obtain its funds by virtue of appropriations from the General Assembly, but by tolls and bond issues. See 605 ILCS 10/10, 17, 19 (West 2018); *Graham v. Illinois State Toll Highway Authority*, 182 Ill. 2d 287, 290-91 (1998). Thus, the State Prompt Payment Act does not apply here. The trial court did not err in refusing to award interest under either Act. Therefore, we reject plaintiff's first contention of error.

¶ 65     We turn to plaintiff's second contention of error: that the damages for the value of the scrap generated were against the manifest weight of the evidence. Plaintiff argues that, although the court awarded it $9634.56 for 38 tons of steel and 25 tons of rebar that defendant actually sold, the evidence proved that plaintiff generated far more scrap. Plaintiff relies on (1) McMahon's testimony that there were 120 tons of steel and 100 tons of rebar left on the site, with a total value of $36,460; (2) McMahon's letter to defendant providing these figures; and (3) the fact that, after McMahon inspected the site and photographed the scrap, the site was under defendant's control.

¶ 66     A plaintiff has the burden to establish a reasonable basis for calculating damages. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 107 (2006). We may not disturb the trial court's assessment of damages unless it is against the manifest weight of the evidence. *Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*, 285 Ill. App. 3d 914, 917-18 (1996).

¶ 67     Plaintiff correctly notes the disparity between the figures that McMahon supplied and what the trial court awarded. However, there was some basis in the evidence for the court's refusal to accept plaintiff's numbers. The photographs of the site, which are not in the record on appeal, admittedly depicted a "jumbled tangle of rebar" with pockets of air, not amenable to precise measurement by tape, as would have been a solid cube, for example. McMahon also testified that he estimated the quantity of rebar by multiplying the square footage of the still-intact bridge deck

by the amount of rebar typically present in a square foot of bridge deck. McMahon did not elaborate on this standard or explain how he arrived at the "typical" figure. These infirmities support the court's rejection of plaintiff's calculation of the value of the rebar it had generated.

¶ 68 The salvage also consisted in part of structural steel (primarily beams). Here, the trial court concluded that McMahon's "estimate" was insufficient to establish how much structural steel plaintiff left on the site or how much plaintiff could have received per ton. Given the incompleteness of the record—specifically the absence of any of the exhibits on which the court relied—we cannot say that the court's conclusion that plaintiff was entitled to no more than what defendant actually received for the steel that it sold was against the manifest weight of the evidence. It was incumbent upon plaintiff to establish greater damages with reasonable certainty, and plaintiff did not do so here. To disturb the award would require us to speculate about too many unknowns, including what happened to the scrap left onsite after plaintiff was properly barred, what a proper price per ton would have been at the time of any sale, and what the exhibits not of record might prove. Accordingly, we decline to disturb the damages for the value of the rebar and structural steel that plaintiff generated, $9634.56.

¶ 69                                    III. CONCLUSION

¶ 70 For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 71 Affirmed.